JUN 2 9 2023

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FT. LAUD.

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 23 - Cr - 60129 - Moore / Louis

18 U.S.C. § 371
18 U.S.C. § 1349
26 U.S.C. § 7206(2)
26 U.S.C. § 7212(a)
18 U.S.C. § 1512(k)
18 U.S.C. § 1512(c)
18 U.S.C. § 401(3)

UNITED STATES OF AMERICA

    v.

MICHAEL L. MEYER

       Defendant.

_____/

## INDICTMENT

The Grand Jury charges that:

### Introduction

At times relevant to this Indictment:

1.    **MICHAEL L. MEYER** was a resident of Evansville, Indiana until in or around 2015. Since 2015, **MEYER** was a resident of Davie and Southwest Ranches, Florida in the Southern District of Florida. **MEYER** was an attorney licensed to practice law in Indiana and Kentucky. **MEYER** represented that he had the following licenses and accreditations: Certified Public Accountant, Master of Business Administration, and certified valuation appraiser.

2.    Since 1999, **MEYER** organized, marketed, and sold an illegal tax shelter called, among other things, the Ultimate Tax Plan. **MEYER** and his co-conspirators marketed the Ultimate Tax Plan as a way for high-income clients to claim a charitable contribution tax

deduction by purportedly donating assets to charity without giving up control of the "donated" assets. **MEYER** told clients that the plan allowed them to loan their "donated" assets back to themselves and allowed them to buy back their "donations" at a significantly discounted price after three years. This was false and illegal. To claim a charitable contribution tax deduction, the taxpayer must completely relinquish dominion and control over the donated property and may not retain use of the donated property or expect a substantial benefit in return.

3.      As part of the plan, **MEYER** created boilerplate transaction documents to use with clients, prepared appraisals of the purported donations, prepared and signed IRS Appraisal Forms for clients, assisted in the preparation of federal and state tax returns, controlled the charities that received the purported donations through nominees, and represented clients who were audited by the Internal Revenue Service ("IRS").

4.      **MEYER** and his co-conspirators created backdated documents for clients to illegally claim charitable contribution tax deductions after the close of the tax year.

### Related Entities and Individuals

5.      In or about October 2012, **MEYER** established Kingdom Advisors, LLC with the Indiana Secretary of State. **MEYER** used Kingdom Advisors to provide clients with accounting, business, and appraisal services.

6.      Rao Garuda, charged elsewhere, was President and Chief Executive Officer of Associated Concepts Agency, Inc. ("ACA"), a financial planning firm located in Cuyahoga County, Ohio. Beginning in or about January 2013, Garuda assisted **MEYER** by marketing and implementing the Ultimate Tax Plan to clients.

7.      Cullen Fischel, charged elsewhere, worked at ACA from May 2015 through August 2020.

8.      National Endowment Association, Inc. ("NEA") was an Indiana nonprofit organization incorporated on or about August 5, 1999.  Under 26 U.S.C. § 501(c)(3), NEA was exempt from federal taxes.  **MEYER**, his father, and his mother were officers of NEA.

9.      Grace Heritage Corporation ("Grace Heritage") was an Indiana nonprofit organization formed in or about February 2007.  Under 26 U.S.C. § 501(c)(3), Grace Heritage was exempt from federal taxes.  **MEYER**'s father and mother were the initial officers of Grace Heritage.  Later, Individual A and then **MEYER** became officers of Grace Heritage.

10.     Indiana Endowment Fund, Inc. ("IEFund") was an Indiana nonprofit organization formed in or about January 2006.  Under 26 U.S.C. § 501(c)(3), IEFund was exempt from federal taxes.  **MEYER**, his father, and his mother were initially officers of IEFund.  In or about 2012, Individual A became an officer of IEFund and, in or about 2013, Individual B became an officer of IEFund.

11.     Indiana Endowment Foundation, Inc. ("IEFoundation") was an Indiana nonprofit organization formed in or about June 2016.  Under 26 U.S.C. § 501(c)(3), IEFoundation was exempt from federal taxes.  Individuals A and B were listed as the officers of IEFoundation.

12.     Compassion Beyond Borders, Inc. ("CBB") was a nonprofit organization established by Garuda in or about April 2016.  Under 26 U.S.C. § 501(c)(3), CBB was exempt from federal taxes.  Garuda and Fischel served as the President and Vice President, respectively.

13.     Charity A was a Nevada nonprofit organization formed in or about 2018.  Under 26 U.S.C. § 501(c)(3), Charity A was exempt from federal taxes.  Individual C, a co-conspirator known to the Grand Jury, controlled Charity A.

3

### The Internal Revenue Service and Its Forms

14.     The Internal Revenue Service ("IRS") was an agency of the United States Department of the Treasury responsible for administering the federal tax laws of the United States and collecting taxes owed to the United States.

15.     An IRS Form 1040, U.S. Individual Income Tax Return, ("Form 1040") was a form used by U.S. taxpayers to report income, gains, losses, deductions, credits, and taxes that occurred during the tax year.   A Form 1040X, Amended U.S. Individual Income Tax Return, ("Form 1040X") was a form used to amend a previously filed income tax return.

16.     An IRS Form 8283, Noncash Charitable Contributions ("Appraisal Form 8283"), was a form used to provide the appraised value, the date of the contributions, and other information for noncash charitable contributions made by taxpayers.  The IRS required the Appraisal Form 8283 to be attached to income tax returns that claimed noncash charitable contributions over $500.  If the noncash charitable contributions were over $5,000, then the donee organization that received the contribution and the appraiser who determined the value of the contribution are required to sign the Appraisal Form.

17.     An IRS Form 990, Return of Organization Exempt from Income Tax, ("Form 990") was a return filed by tax-exempt organizations to report information to the IRS, such as gross income, receipts, and disbursements.

18.     A Closing Agreement on Final Determination Covering Specific Matters with the IRS ("Closing Agreement") was a written settlement agreement with the IRS that, among other things, conclusively settled an individual's or entity's IRS status, tax liability or the tax consequences of a transaction.

4

## Charitable Contribution Tax Deductions

19.     Taxpayers may claim a tax deduction on their tax return for a charitable contribution made within that tax year.

20.     To claim a charitable contribution tax deduction, the taxpayer must completely relinquish dominion and control over the contributed property and may not retain enjoyment of the subject of the gift or otherwise expect a substantial benefit in return.

21.     A taxpayer's mere promise to pay a charity is not deductible.  Likewise, a taxpayer's promissory note, given without consideration, to a charitable organization represents a mere promise to pay at some future date and is not a payment for purposes of a charitable contribution tax deduction.  The taxpayer may claim a charitable contribution tax deduction in the tax year that the payments are actually made to the charity.

22.     Taxpayers claiming a noncash charitable deduction of more than $5,000 must obtain a qualified appraisal of the property donated to charity.  An appraisal is a "qualified appraisal" if it is, among other things, prepared, signed, and dated by a qualified appraiser and the fee paid to the appraiser is not prohibited.  An appraisal fee is prohibited when it is based, in effect, on a percentage of the appraised value of the property.

23.     Taxpayers may not claim a charitable contribution tax deduction unless he or she received a contemporaneous written acknowledgment from the donee organization that listed, among other things, a description of the donated property and a statement of whether the donee organization provided goods of services in consideration for the donation.

## The Ultimate Tax Plan

### *The Mechanics of the Ultimate Tax Plan*

24.     **MEYER**, Garuda, Fischel, and others organized, marketed, and implemented the Ultimate Tax Plan as a way for high-income clients to decrease their taxes on their income tax returns by claiming false charitable contribution tax deductions.

25.     The Ultimate Tax Plan involved the following steps:

a.   **MEYER** formed a limited liability company or a partnership (an "Entity");

b.   **MEYER** caused the client to transfer their asset, such as cash, securities, real estate, and other business interests, to the Entity in exchange for 100% ownership interest in the Entity;

c.   **MEYER** caused the client to assign 99% or 100% ownership interest in their Entity to a purported Charity controlled by **MEYER** or his co-conspirators (a "Charity"), such as Grace Heritage, IEFund, IEFoundation, or CBB;

d.   **MEYER** caused the client to sign paperwork, including an operating agreement for the Entity according to which the client retained control of the Entity as manager, a document issuing interests in the Entity to the client (an "issuance document"), and an assignment document assigning the Entity interests to a charity (an "assignment document"), (collectively, "Transaction documents");

e.   **MEYER** provided a signed Appraisal Form 8283 in exchange for the assignment of their Entity to the Charity. **MEYER** signed the Appraisal Form 8283 as the appraiser, and a representative of the recipient charity also signed the form; and

f.   **MEYER** caused the client to falsely claim a charitable contribution tax deduction on their federal tax return in the amount reported on the Appraisal Form 8283.

6

*The Marketing and Implementation of the Ultimate Tax Plan*

26.      **MEYER** trained Garuda, Fischel and others to market the Ultimate Tax Plan to clients as a way to grow assets tax-free within the client's Entity and to pass the assets in the Entity to the client's heirs without paying any estate taxes.

27.      **MEYER**, working with Garuda and Fischel, structured, marketed, and implemented the Ultimate Tax Plan to make it appear as if the clients made charitable donations on paper, but in reality, clients retained dominion and control over their "donated" Entities and assets.  The Ultimate Tax Plan did not alter clients' access to their assets that were purportedly donated.  Clients handled their business and property interests in substantially the same way both before and after the purported donations to the Charity.

28.      **MEYER**, working with Garuda and Fischel, directed clients to use the donated assets for their own personal use by taking tax-free loans from the Entities.

29.      **MEYER**, working with Garuda and Fischel, structured and implemented the Ultimate Tax Plan so that the Charity had no control over the Entities or the Entities' assets despite purportedly receiving the donation and owning the Entities on paper.

30.      **MEYER**, working with Garuda and others, created and marketed an "exit strategy" to allow clients to buy back the donated ownership interest of their Entity from the Charity at a significantly discounted rate (the "exit strategy").

31.      **MEYER**, working with Garuda and Fischel, instructed clients not to take any loans or complete the exit strategy within three years of claiming the charitable contribution tax deduction on their tax returns.

32.      **MEYER** controlled NEA, Grace Heritage, IEFund, and IEFoundation through nominees.

33.     **MEYER**, working with Garuda and Fischel, advised clients to actually donate one percent of the funds to legitimate charities per year and in practice, only a small fraction of charitable tax deductions were donated to legitimate charities.

34.     **MEYER**, working with Garuda and Fischel, caused some clients to sign promissory notes as the basis of their charitable contribution tax deductions.

35.     **MEYER** falsely reported on Appraisal Forms 8283 that he was a qualified appraiser.  **MEYER** also falsely certified that the appraisal fees he earned were not based on a percentage of the appraised property value.

36.     **MEYER** and others caused the preparation of false tax returns that improperly claimed charitable contribution tax deductions on their tax returns despite knowing that contributions failed to constitute a gift for federal tax purposes.

### IRS Audit Activity

37.     In or about May 2012, the IRS informed NEA that it sought to revoke NEA's tax-exempt status.  On or about May 16, 2014, **MEYER**, on behalf of NEA, signed a Closing Agreement that provided, among other things, that **MEYER** used NEA to promote a tax planning strategy using charitable deductions and that NEA did not qualify for tax exempt status.

38.     After an audit of Grace Heritage, the IRS notified **MEYER** that it intended to revoke Grace Heritage's status as a tax-exempt charitable organization. In or about May 2017, **MEYER**, on behalf of Grace Heritage, signed a Closing Agreement that provided, among other things, that **MEYER** used Grace Heritage to promote a tax planning strategy using charitable deductions and that Grace Heritage did not qualify for tax exempt status.

39.     In or around January 2015, the IRS informed **MEYER** of an audit of IEFund.  In or about May 2017, **MEYER**, on behalf of IEFund, signed a Closing Agreement that provided,

among other things, that **MEYER** used IEFund to promote a tax planning strategy using charitable deductions and that IEFund did not qualify for tax exempt status.

### The Civil Injunction Lawsuit

40.     To stop **MEYER** from promoting and selling his scheme, on April 3, 2018, the United States filed a Complaint for Permanent Injunction and Other Relief against **MEYER** in the United States District Court for the Southern District of Florida (the "Injunction Suit").

41.     During civil discovery in the Injunction Suit, the United States issued civil subpoenas to witnesses, including ACA and clients who executed the Ultimate Tax Plan, that requested the production of documents. The United States served document requests on **MEYER** that sought the production of documents related to the Ultimate Tax Plan.

42.     On April 26, 2019, the United States District Court for the Southern District of Florida, by Court Order, entered a permanent injunction against **MEYER** that, among other prohibitions, barred him from organizing, promoting, marketing, or selling the Ultimate Tax Plan.

### Count One
*Conspiracy to Defraud the United States*
(18 U.S.C. § 371)

43.     From at least January 2013 through April 2021, both dates being approximate and inclusive, in the Southern District of Florida and elsewhere, the defendant,

**MICHAEL L. MEYER,**

Rao Garuda, Cullen Fischel, and others did unlawfully, voluntarily, intentionally, and knowingly conspire, combine, confederate, and agree together and with each other, and with other individuals both known and unknown to the grand jury, to defraud the United States by impeding, impairing, obstructing, and defeating the lawful government functions of the IRS in

the ascertainment, computation, assessment, and collection of revenue, that is, U.S. individual income taxes.

Manner and Means of the Conspiracy

44.     The manner and means by which Defendant and his co-conspirators carried out the conspiracy included, but were not limited to, the following:

45.     **MEYER**, Garuda, Fischel, and others designed, marketed, and implemented the Ultimate Tax Plan as a way for high-income clients to decrease their taxes on their income tax returns by claiming false charitable contribution tax deductions.

46.     **MEYER**, Garuda, Fischel, and other co-conspirators, illegally backdated documents, including but not limited to Transaction documents, and prepared false Appraisal Forms 8283 to assist clients in claiming tax deductions after the close of the tax year, while fully knowing that a taxpayer may not claim a charitable contribution tax deduction unless the charitable contribution was made during that same tax year.

47.     **MEYER** falsely reported on Appraisal Forms 8283 that he was a qualified appraiser, falsely certified that the appraisal fees he earned were not based on a percentage of the appraised property value, and falsely claimed that clients made a noncash charitable contribution.

48.     **MEYER**, Garuda, Fischel and others assisted clients in filing Forms 1040 and 1040X that falsely claimed charitable contribution tax deductions.

49.     After the United States filed the Injunction Suit and issued civil subpoenas to ACA and clients, **MEYER**, working with Garuda, Fischel, and others, prepared backdated documents, including issuance documents, assignment documents, promissory notes, and written acknowledgements, and directed ACA and clients to submit them to the United States in response to the civil subpoenas.

10

50.     After the issuance of the permanent injunction by the United States District Court for the Southern District of Florida, **MEYER**, working with Garuda and Fischel, directed clients to transfer their ownership interests in their Entities to Charity A and informed them they could continue to operate the Ultimate Tax Plan.

51.     **MEYER** charged and received fees for selling the Ultimate Tax Plan to taxpayers, including charging his clients a fee based on a percentage of the amount transferred to the Entity and an annual administration fee, typically $2,500 (the "administration fee.")

52.     Since 2013, **MEYER** and his co-conspirators earned more than $10 million from the execution of the Ultimate Tax Plan. **MEYER** spent that income on personal expenses, including to purchase a multi-million-dollar residential estate and a luxury vehicle collection, which included Lamborghinis, Rolls Royces, Mercedes Benzes, a Bentley, and a Ferrari.

### Overt Acts

53.     In furtherance of the conspiracy and to bring about its purpose, the following overt acts, among others, were committed in the Southern District of Florida and elsewhere, by at least one conspirator:

54.     In or about April and May 2016, at the direction of **MEYER**, Garuda established CBB. **MEYER** directed Garuda that when dealing with IRS that Garuda should "not get into the LLCs or our plan."

55.     On or about May 12, 2016, **MEYER** and Garuda prepared and caused to be filed with the IRS a false IRS Form 1023, Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code, for CBB.

*Client 1*

56.     Between in or about April and August 2017, **MEYER**, Garuda, and Fischel marketed and sold the Ultimate Tax Plan to Client 1, charged elsewhere, as a way for Client 1 to claim a false charitable contribution tax deduction for tax year 2016 and promoted, among other things, the "exit strategy."

57.     In or about August 2017, **MEYER**, Fischel, and Garuda prepared and caused to be prepared for Client 1 a promissory note and Transaction documents.  The promissory note and Transaction documents were backdated to 2016 to make it appear as if the Ultimate Tax Plan was executed in the prior year.  Client 1 signed the backdated Transaction documents and promissory note.

58.     In or about August 2017, following the directions of **MEYER** and Garuda, Client 1 transferred his ownership interest in a real estate company to his Entity to purportedly pay off the promissory note.  Despite purportedly transferring ownership of the real estate company, Client 1 operated the real estate company in substantially the same way both before and after the purported donations to CBB.

59.     In or about September 2017, **MEYER** and Garuda prepared and caused to be prepared an Appraisal Form 8283 for Client 1 that falsely reported that Client 1 made a charitable contribution on December 31, 2016, valued at $400,500.  **MEYER** falsely declared on the Appraisal Form 8283 that he was a qualified appraiser and that the appraisal fees were not based on a percentage of the appraised property value.

60.     On or about October 18, 2017, **MEYER**, Garuda and Fischel assisted Client 1 in filing a false 2016 Form 1040X for Client 1 and his wife claiming a $400,500 charitable contribution tax deduction.

12

61.     On or about April 15, 2018, **MEYER**, Garuda, and Fischel assisted Client 1 in filing a false 2017 Form 1040 claiming a $176,770 charitable contribution tax deduction.

62.     In or about August 2020, after the United States District Court entered the permanent injunction against **MEYER** in April 2019, **MEYER** discussed with Client 1 the exit strategy.

63.     On or about April 5, 2021, **MEYER** prepared and emailed to Client 1 a Schedule K-1 that claimed Client 1 had obtained back his ownership of his Entity.

### *Client 2*

64.     Between in or about March and September 2017, **MEYER** marketed and sold the Ultimate Tax Plan to Client 2, charged elsewhere, as a way for Client 2 to claim a false charitable contribution tax deduction for tax year 2016.

65.     In or about April 2017, **MEYER** prepared and caused to be prepared Transaction documents for Client 2.  The Transaction documents were backdated to 2016 to make it appear as if the Ultimate Tax Plan was executed in the prior year.  Client 2 signed the backdated Transaction documents.

66.     In or about September 2017, at the direction of **MEYER**, Client 2 transferred partial ownership of his company to the Entity and the Entity's ownership interests were purportedly donated to IEFoundation. Client 2 operated his company in substantially the same way both before and after the purported charitable donation to IEFoundation.

67.     On or about September 7, 2017, **MEYER** prepared and caused to be prepared an Appraisal Form 8283 for Client 2 that falsely reported that Client 2 made a charitable contribution on December 31, 2016, valued at $881,100.  **MEYER** falsely declared on the

Appraisal Form 8283 that he was a qualified appraiser and that the appraisal fees were not based on a percentage of the appraised property value.

68.     On or about October 16, 2017, **MEYER** assisted Client 2 in filing a false 2016 Form 1040 claiming an $881,100 charitable contribution tax deduction.

### *Client 3*

69.     Between in or about July and October 2017, **MEYER,** Garuda, and Fischel marketed and sold the Ultimate Tax Plan to Client 3 as a way for Client 3 to claim a false charitable contribution tax deduction for tax year 2016.

70.     In or about September 2017, **MEYER** prepared and caused to be prepared a promissory note and Transaction documents.  The Transaction documents and promissory note were backdated to 2016 to make it appear as if the Ultimate Tax Plan was executed in the prior year.  Client 3 signed the backdated Transaction documents and note.

71.     In or about September 2017, **MEYER**, Fischel and Garuda prepared and caused to be prepared an Appraisal Form 8283 for Client 3 that falsely reported that Client 3 made a charitable contribution on December 31, 2016, valued at $640,800.  **MEYER** falsely declared on the Appraisal Form 8283 that he was a qualified appraiser and that the appraisal fees were not based on a percentage of the appraised property value.

72.     On or about October 16, 2017, **MEYER**, Garuda, and Fischel assisted Client 3 in filing a false 2016 Form 1040 claiming a $640,800 charitable contribution tax deduction.

73.     On or about October 1, 2017, at the direction of **MEYER**, Garuda, and Fischel, Client 3 opened a financial account in the name of their Entity and maintained sole signature authority.  Client 3 spent most of the funds to purchase retirement annuities.

74.     On or about October 15, 2018, **MEYER**, Garuda, and Fischel assisted Client 3 in filing a false 2017 Form 1040 claiming a $320,400 charitable contribution tax deduction.

*Client 4*

75.     Between in or about May and August 2016, **MEYER,** Garuda, and Fischel marketed and sold the Ultimate Tax Plan to Client 4 as a way for Client 4 to claim a false charitable contribution tax deduction for tax year 2015.

76.     In or about August 2016, **MEYER** prepared and caused to be prepared a promissory note and Transaction documents.  The Transaction documents and promissory note were backdated to 2015 to make it appear as if the Ultimate Tax Plan was executed in the prior year.  Client 4 signed the backdated Transaction documents and promissory note.

77.     In or about August 2016, **MEYER** and Garuda prepared and caused to be prepared an Appraisal Form 8283 for Client 4 that falsely reported that Client 4 made a charitable contribution on December 31, 2015, valued at $400,000.  **MEYER** falsely declared on the Appraisal Form 8283 that he was a qualified appraiser and that the appraisal fees were not based on a percentage of the appraised property value.

78.     On or about October 17, 2016, **MEYER**, Garuda and Fischel assisted Client 4 in filing a false 2015 Form 1040 claiming a $400,000 charitable contribution tax deduction.

79.     On or about November 18, 2016, at the direction of **MEYER**, Garuda, and Fischel, Client 4 and his wife opened a financial account in the name of their Entity and maintained sole signature authority.  Client 4 withdrew over $1 million from his Entity's bank account for personal expenses, including constructing a ranch, building a swimming pool, and purchasing ATVs.

80.     On or about April 15, 2017, **MEYER**, Garuda, and Fischel assisted Client 4 in filing a false 2016 Form 1040 claiming a $320,400 charitable contribution tax deduction.

81.     On or about October 9, 2018, **MEYER**, Garuda, and Fischel assisted Client 4 in filing a false 2017 Form 1040 claiming a $320,400 charitable contribution tax deduction.

### *Client 5*

82.     Between in or about June and August 2017, **MEYER**, Garuda, and Fischel marketed and sold the Ultimate Tax Plan to Client 5 as a way for Client 5 to claim a false charitable contribution tax deduction for tax year 2016.

83.     In or about June 2017, **MEYER** prepared and caused to be prepared a promissory note and Transaction documents.  The Transaction documents and promissory note were backdated to 2016 to make it appear as if the Ultimate Tax Plan was executed in the prior year. Client 5 signed the backdated Transaction documents and promissory note.

84.     In or about August 2017, **MEYER** and Garuda prepared and caused to be prepared an Appraisal Form 8283 for Client 5 that falsely reported that Client 5 made a charitable contribution on December 31, 2016, valued at $200,500.  **MEYER** falsely declared on the Appraisal Form 8283 that he was a qualified appraiser and that the appraisal fees were not based on a percentage of the appraised property value.

85.     On or about August 31, 2017, **MEYER**, Garuda, and Fischel assisted Client 5 in filing a false 2016 Form 1040 claiming a $200,250 charitable contribution tax deduction.

86.     In or about September 4, 2017, at the direction of **MEYER**, Garuda, and Fischel, Client 5 and his wife opened a financial account in the name of their Entity and maintained sole signature authority.  Client 5 spent most of the funds to purchase retirement annuities.

16

87.     On or about August 27, 2018, **MEYER**, Garuda, and Fischel assisted Client 5 in filing a false 2017 Form 1040 claiming a $200,250 charitable contribution tax deduction.

*Client 6*

88.     Between in or about June and October 2013, **MEYER** and Garuda marketed and sold the Ultimate Tax Plan to Client 6 as a way for Client 6 to claim a false charitable contribution tax deduction for tax year 2012.

89.     In or about June 2013, **MEYER** prepared and caused to be prepared a promissory note and Transaction documents.  The Transaction documents and promissory note were backdated to 2012 to make it appear as if the Ultimate Tax Plan was executed in the prior year.

90.     In or about June 2013, **MEYER** and Garuda prepared and caused to be prepared a false Appraisal Form 8283 for Client 6 that falsely reported that Client 6 made a charitable contribution on December 31, 2012, valued at $391,500.  **MEYER** falsely declared on the Form 8283 that he was a qualified appraiser and falsely certified that the appraisal fees were not based on a percentage of the appraised property value.

91.     On or about October 23, 2013, **MEYER** and Garuda assisted Client 6 in filing a false 2012 Form 1040 claiming a $391,500 charitable contribution tax deduction.

92.     On or about December 19, 2016, Fischel told **MEYER** that Client 6 had not paid off the promissory note that formed the basis of the 2012 charitable tax deduction and owed $499,272 on the note.  In response, **MEYER** advised: "[Client 6] is past his statute so I am not really worried about him."

93.     On or about October 18, 2019, **MEYER** lied to the representative of Charity A by stating that Client 6 "contributed a Promissory note in 2012 and paid it off.  It was $500K."

94.     In or about December 2019, **MEYER**, Garuda, and Fischel caused documents to be created that purportedly showed the ownership interest in Client 6's Entity to be transferred from CBB to Charity A.

### *Client 7*

95.     Between in or about December 2016 and February 2017, **MEYER**, Garuda, and Fischel marketed and sold the Ultimate Tax Plan to Client 7 as a way for Client 7 to claim charitable contribution tax deductions.

96.     In or about February 2017, after Attorney 1 advised that "the transaction is clearly fraudulent and will not withstand scrutiny from the IRS for a whole host of reasons," **MEYER** falsely represented in a telephone call with Garuda, Fischel, Client 7, Attorney 1 and others that the IRS did not question his plan.

97.     In or about February 2017, **MEYER** agreed to sign Client 7's tax return after Client 7's accountants informed **MEYER** that they would not sign Client 7's tax return claiming the charitable contribution tax deduction.

98.     In or about February 2017, **MEYER** and Garuda prepared and caused to be prepared an Appraisal Form 8283 for Client 7 that falsely reported that Client 7 made a charitable contribution on December 31, 2016, valued at $360,450.  **MEYER** falsely declared on the Appraisal Form 8283 that he was a qualified appraiser and that the appraisal fees were not based on a percentage of the appraised property value.

99.     On or about September 21, 2017, **MEYER** and Garuda assisted Client 7 in filing a false 2016 Form 1040 claiming a charitable contribution deduction in the amount of $360,450.

100.     On or about May 14, 2018, **MEYER** and Garuda assisted Client 7 in filing a false 2017 Form 1040 claiming a charitable contribution deduction in the amount of $1,222,763.

18

101.    On or about December 22, 2016, at the direction of **MEYER**, Garuda, and Fischel, Client 7 opened a financial account in the name of his Entity and maintained sole signature authority with his wife.  Client 7 spent most of the funds on retirement annuities.

102.    After the United States District Court entered the permanent injunction against **MEYER** in April 2019, on or about August 8, 2019, **MEYER** advised Client 7 on the Ultimate Tax Plan.

103.    On or about March 27, 2020, **MEYER** advised Client 7 regarding the transfer of ownership of his Entity to Charity A.

### *Client 8*

104.    In 2014, **MEYER** and Garuda marketed and sold the Ultimate Tax Plan to Client 8 as a way for Client 8 to claim a false charitable contribution tax deduction for tax year 2013.

105.    On or about April 13, 2014, **MEYER** and Garuda prepared and caused to be prepared an Appraisal Form 8283 for Client 8 that falsely reported that Client 8 made a charitable contribution on December 31, 2013, valued at $274,050.  **MEYER** falsely declared on the Appraisal Form 8283 that he was a qualified appraiser and that the appraisal fees were not based on a percentage of the appraised property value.

106.    On or about June 4, 2014, **MEYER** and Garuda assisted Client 8 in filing a false 2013 Form 1040 claiming a $274,050 charitable contribution deduction.

107.    On or about July 13, 2015, **MEYER** and Garuda assisted Client 8 in filing a false 2014 Form 1040 claiming a $314,000 charitable contribution deduction.

108.    On or about April 15, 2016, **MEYER** and Garuda assisted Client 8 in filing a false 2015 Form 1040 claiming a $320,000 charitable contribution deduction.

109.    On or about July 12, 2017, **MEYER** participated in a conference call with Garuda and Client 8 and explained how the exit strategy worked:

> [W]e are great with buyouts. . . . The charity is basically controlled by us. So we understand how this works and we understand what we need to do in order to make that work. . . . The buyouts have come back around $0.10 on the dollar. That's really what it usually comes down to. So if you got $1 million in there and you want to buy it back, it's going to cost you $100,000. Now, you'll probably save yourself $300,000 or $400,000 in income tax when you put the $1 million in there, right, because you got the tax deduction.
>
> So it's always a win-win, you know, for you and our charity at the same point in time.

### Client 9

110.    In 2013, **MEYER** and Garuda marketed and promoted the Ultimate Tax Plan to Client 9 as a way for Client 9 to claim a false charitable contribution tax deduction for 2012.

111.    On or about the dates and amounts below, **MEYER** and Garuda assisted Client 9 in filing false Forms 1040 claiming charitable contribution tax deductions as follows:

| TAX YEAR | APPROXIMATE DATE OF FILING | CLAIMED CHARITABLE DEDUCTIONS |
|---|---|---|
| 2012 | 9/9/2013 | $391,500 |
| 2013 | 10/9/2014 | $1,174,500 |
| 2014 | 8/7/2015 | $477,280 |
| 2015 | 10/13/2016 | $645,975 |
| 2016 | 10/9/2017 | $500,625 |
| 2017 | 10/10/2018 | $600,750 |
| **TOTAL** | | **$3,790,630** |

112.    In or around 2014, **MEYER** and Garuda caused the Charity to enter into a written agreement with Client 9 to memorialize the exit strategy.

113.    On or about April 20, 2019, one day after **MEYER** signed a stipulation for entry of the permanent injunction, **MEYER** executed the exit strategy for Client 9 to purchase back their interest for $225,000.

20

114.    On or about April 22, 2019, **MEYER** deposited a check from Client 9 for $225,000 payable to Kingdom Advisors and subsequently, directed $224,000 to his personal bank account.

### *Client 10*

115.    In or about April 2013, **MEYER** and Garuda marketed and sold the Ultimate Tax Plan to Client 10 as a way for Client 10 to claim a false charitable contribution tax deduction for 2012.

116.    On or about the dates and amounts below, **MEYER** and Garuda assisted Client 10 in filing false Forms 1040 claiming charitable contribution tax deductions as follows:

| TAX YEAR | APPROXIMATE DATE OF FILING | CLAIMED CHARITABLE DEDUCTIONS |
|---|---|---|
| 2012 | 6/18/2013 | $252,000 |
| 2013 | 4/15/2014 | $156,600 |
| 2014 | 7/3/2015 | $195,750 |
| 2015 | 8/4/2016 | $160,000 |
| **TOTAL** | | **$764,350** |

117.    In or about January and February 2017, **MEYER**, Fischel, and Garuda offered and executed an agreement in which Client 10 purchased back their purported donated interest in their Entity for $10,000.

### *Responses to the Injunction Lawsuit*

118.    After the Injunction Suit was filed, in May or June 2018, Fischel, **MEYER,** and Garuda agreed to create and backdate Transaction documents and written acknowledgments from the Charities for the purported donations made by their clients.

119.    In or about June 2018, **MEYER** prepared backdated issuance documents, assignment documents, and written acknowledgement letters for clients.  **MEYER** instructed Fischel to send the backdated documents by mail or deliver in person to clients to sign.

120.    In or about June 2018, after Client 10 received a civil subpoena from the United States requesting documents, **MEYER**, Garuda, and Fischel prepared and caused to be prepared backdated promissory notes, a backdated attorney engagement agreement, backdated written acknowledgments, and backdated issuance and assignment documents for Client 10.

121.    In or about June 2018, **MEYER**, Fischel and Garuda caused Client 10 to send the backdated promissory notes, backdated written acknowledgements, backdated issuance and assignment documents, and the backdated attorney engagement agreement in response to the civil subpoena.

122.    In or about June 2018, after Clients 11 and 12 each received a civil subpoena from the United States requesting documents, **MEYER**, Garuda, and Fischel prepared and caused to be prepared backdated written acknowledgments and backdated issuance and assignment documents for Clients 11 and 12.

123.    In or about July 2018, **MEYER**, Fischel and Garuda caused Clients 11 and 12 to send the backdated issuance and assignment documents in their responses to the civil subpoenas.

124.    In or about August 2018, **MEYER** provided an alternate email address to Fischel and others to use in sending **MEYER** the executed backdated documents.

125.    In or about August or September 2018, after Client 13 received a civil subpoena from the United States requesting documents, **MEYER**, Garuda, and Fischel prepared and caused to be prepared backdated written acknowledgments and backdated issuance and assignment documents for Client 13.

126.    In or around September 2018, **MEYER**, Fischel and Garuda caused Client 13 to send the backdated written acknowledgements and backdated issuance and assignment documents in response to the civil subpoena.

22

127.    On or about September 5, 2018, after **MEYER** informed Fischel that he was still missing signed copies of the issuance and assignment documents for Clients 8 and 13, Fischel emailed **MEYER**, using **MEYER**'s alternate email address, the backdated issuance and assignment documents for those clients.

128.    In or about November 2018, **MEYER**, Fischel and Garuda caused ACA to include in its response to a civil subpoena from the United States, among other things, backdated written acknowledgements and backdated issuance and assignment documents for clients, including Clients 4, 10, and 13.

All in violation of 18 U.S.C. § 371.

### Count Two
*Mail and Wire Fraud Conspiracy*
18 U.S.C. § 1349

129.    The Grand Jury realleges and incorporates by reference the factual allegations in paragraphs 1 through 128 of this Indictment.

130.    Beginning at least in or about January 2013 through at least in or about April 2021, the exact dates being unknown to the Grand Jury, within the Southern District of Florida and elsewhere, the defendant,

**MICHAEL L. MEYER,**

did knowingly and willfully combine, conspire, confederate, and agree with Rao Garuda, Cullen Fischel and others, both known and unknown to the Grand Jury, to commit an offense against the United States, that is:

a.    To knowingly and with intent to defraud, devise, and intend to devise, a scheme and artifice to defraud and to obtain money and property, including fees and commissions, by means of materially false and fraudulent pretenses, representations, and promises, to wit, a scheme to defraud the IRS through the design,

23

marketing, and implementation of the above-described Ultimate Tax Plan, for the purpose of executing such scheme and artifice and attempting to do so, knowing that they were false and fraudulent when made, did knowingly transmit and cause to be transmitted by means of wire communication in interstate commerce any writings, signs, signals, pictures, and sounds for the purpose of executing the scheme and artifice, in violation of Title 18, United States Code, Section 1343, and,

b.  To knowingly and with intent to defraud, devise, and intend to devise, a scheme and artifice to defraud and to obtain money and property, including fees and commissions, by means of materially false and fraudulent pretenses, representations, and promises, to wit, a scheme to defraud the IRS through the design, marketing, and implementation of the above-described Ultimate Tax Plan, for the purpose of executing such scheme and artifice and attempting to do so, knowing that they were false and fraudulent when made, did knowingly transmit and cause to be transmitted by means of the United States Postal Service or a private or commercial interstate carrier, some matter or thing for the purpose of executing the scheme and artifice, in violation of Title 18, United States Code, Section 1341.

<u>Scheme to Defraud</u>

131.    Throughout the conspiracy, **MEYER**, Garuda, Fischel, and others utilized the United States Postal Service, commercial interstate carriers, and interstate wires to (1) email and mail promotional material to clients to entice them to enroll in the Ultimate Tax Plan; (2) communicate with clients regarding the Ultimate Tax Plan; (3) email and mail documents for use in implementing the Ultimate Tax Plan, including documents that **MEYER**, Garuda, Fischel, and others backdated; (4) email and mail false Appraisal Forms 8283 to be used by the clients to prepare and file false tax returns that claimed noncash charitable contribution tax deductions that they were not permitted to claim; (5) email and mail backdated documents in order for clients to respond to subpoenas from the Injunction Suit; and (6) wiring and mailing payments, commissions, and fees to **MEYER**, Garuda and others.

132. **MEYER**, Garuda, Fischel and others, known and unknown to the Grand Jury, further carried out the conspiracy through the manner and means described in paragraphs 45 through 52 of this Indictment, among others.

All in violation of 18 U.S.C. § 1349.

### Counts Three through Twenty-Eight
*Aiding and Assisting in the Preparation of False Tax Returns*
(26 U.S.C. § 7206(2))

133. The Grand Jury realleges and incorporates by reference the factual allegations in paragraphs 1 through 42 of this Indictment.

134. On or about the dates set forth below, in the Southern District of Florida and elsewhere, the defendant,

### MICHAEL L. MEYER,

did willfully aid and assist in, and procure, counsel, and advise the preparation and presentation to the IRS of Forms 1040 and Forms 1040X, both individual and joint, for the taxpayers and tax years set forth below. The returns were false and fraudulent in that they represented that the taxpayers were entitled to claim noncash charitable contributions related in the amounts listed on the taxpayers' returns, whereas, **MEYER** then and there knew and believed that these taxpayers were not entitled to claim those noncash charitable contributions identified below:

| Count | Taxpayer | Date Filed (Approximate) | Tax Year | False Item on Appraisal Form 8283 | False Item on Schedule A, Line 17 |
|---|---|---|---|---|---|
| 3 | Client 1 | 10/18/2017 | 2016 | $400,500 | $400,500 |
| 4 | Client 1's Wife | 4/15/2018 | 2017 | $176,770 | $176,770 |
| 5 | Client 5 | 8/31/2017 | 2016 | $200,250 | $200,740 |
| 6 | Client 5 | 8/27/2018 | 2017 | $200,250 | $200,730 |
| 7 | Client 3 | 10/16/2017 | 2016 | $640,800 | $640,800 |
| 8 | Client 3 | 10/15/2018 | 2017 | $320,400 | $320,400 |
| 9 | Client 4 | 10/17/2016 | 2015 | $400,000 | $400,000 |

| Count | Taxpayer | Date Filed (Approximate) | Tax Year | False Item on Appraisal Form 8283 | False Item on Schedule A, Line 17 |
|---|---|---|---|---|---|
| 10 | Client 4 | 4/15/2017 | 2016 | $320,400 | $320,400 |
| 11 | Client 4 | 10/9/2018 | 2017 | $320,400 | $320,400 |
| 12 | Client 7 | 9/21/2017 | 2016 | $360,450 | $360,450 |
| 13 | Client 7 | 5/14/2018 | 2017 | $1,222,763 | $1,223,238 |
| 14 | Client 2 | 10/16/2017 | 2016 | $881,100 | $881,100 |
| 15 | Client 14 | 12/1/2017 | 2016 | $120,000 | $120,480 |
| 16 | Client 9 | 10/13/2016 | 2015 | $97,875 | $645,975 |
| 17 | Client 9 | 10/9/2017 | 2016 | $500,625 | $500,625 |
| 18 | Client 9 | 10/10/2018 | 2017 | $600,750 | $600,750 |
| 19 | Client 13 | 4/15/2017 | 2016 | $240,300 | $241,975 |
| 20 | Client 13 | 4/15/2018 | 2017 | $60,866 | $60,866 |
| 21 | Client 8 | 4/15/2016 | 2015 | $320,000 | $320,000 |
| 22 | Client 10 | 8/4/2016 | 2015 | $160,000 | $160,000 |
| 23 | Client 11 | 10/14/2016 | 2015 | $783,000 | $784,471 |
| 24 | Client 11 | 10/16/2017 | 2016 | $833,040 | $833,040 |
| 25 | Client 11 | 10/15/2018 | 2017 | $160,200 | $160,200 |
| 26 | Client 12 | 10/17/2016 | 2015 | $783,000 | $783,000 |
| 27 | Client 12 | 10/16/2017 | 2016 | $833,040 | $833,390 |
| 28 | Client 12 | 10/12/2018 | 2017 | $160,200 | $160,200 |

All in violation of 26 U.S.C. § 7206(2).

## Count Twenty-Nine

*Corrupt Endeavor to Obstruct or Impede the Administration of the Internal Revenue Code*
(26 U.S.C. § 7212(a))

135.    The Grand Jury realleges and incorporates by reference the factual allegations in paragraphs 1 through 42 of this Indictment.

136.    Between in or about March and September 2015, **MEYER** marketed and sold the Ultimate Tax Plan to Client 15 as a way for Client 15 to claim a false charitable contribution tax deduction for tax year 2014.

137.    In or about April 2015, **MEYER** prepared and caused to be prepared for Client 15 Transaction documents.  The Transaction documents were backdated to 2014 to make it appear as if the Ultimate Tax Plan was executed in the prior year.

138.    In or about April 2015, **MEYER** prepared for Client 15 an Appraisal Form 8283 for tax year 2014 that falsely stated that Client 15 made a charitable contribution on December 31, 2014, valued at $211,410.  **MEYER** falsely declared on the Form 8283 that he was a qualified appraiser and falsely certified that the appraisal fees were not based on a percentage of the appraised property value.

139.    On or about September 28, 2015, **MEYER** assisted Client 15 in filing a false 2014 Form 1040 claiming a $211,410 charitable contribution tax deduction.

140.    On or about November 30, 2016, as part of an audit of Client 15's 2014 individual income tax return, an IRS Revenue Agent requested more information about the claimed noncash charitable contribution on Client 15's 2014 tax return which was forwarded to **MEYER**.

141.    In response to the IRS's request, on or about December 15, 2016, **MEYER** provided Client 15's financial advisor documentation to provide to the IRS, including an Appraisal Form 8283 that falsely claimed the purported donation of units occurred in 2014, a backdated appraisal, and a backdated written acknowledgment from the Charity.  Client 15's financial advisor, at **MEYER's** request, sent the documents to the IRS.

142.    On or about December 21, 2016, the IRS Revenue Agent requested additional information about Client 15's purported 2014 noncash charitable contribution.

143.    On or about January 2, 2017, and in response to the IRS's request, **MEYER** provided Client 15's financial advisor a letter and memorandum to send to the IRS, each of which contained numerous falsities, including that certain actions were taken in 2014 when they

were taken in 2015, misrepresenting Client 15's investment skills, misrepresenting Client 15's

reason for entering into the Ultimate Tax Plan, and misrepresenting **MEYER**'s role with

IEFund.

144.    On or about January 13, 2017, Client 15's accountant forwarded to the IRS

**MEYER**'s letter and memorandum sent on January 2, 2017.

145.    On or about January 31, 2017, the IRS Revenue Agent requested, among other

things, the LLC Operating Agreement and promissory note related to Client 15's purported 2014

donation of LLC units.

146.    In response to the IRS's request, on or about February 14, 2017, **MEYER**

provided unsigned copies of an LLC agreement and promissory note to Client 15's financial

advisor, each backdated to 2014, and directed Client 15's financial advisor to have Client 15 sign

both and send copies of the signed documents to the IRS Revenue Agent.

147.    On or about February 17, 2017, Client 15's accountant forwarded to the IRS

signed copies of the backdated LLC agreement and backdated promissory note.

148.    In or about March 2017, Client 15 hired Attorney 2 to represent him in the audit.

149.    On or about March 31, 2017, **MEYER** emailed Attorney 2, attaching, among

other things, the backdated issuance and assignment agreements and his memorandum

responding to the first request for information by the IRS in the audit.

150.    From on or about November 30, 2016, through in or about April 21, 2017, in the

Southern District of Florida and elsewhere, the defendant,

**MICHAEL L. MEYER,**

knowing of and reasonably foreseeing the IRS's audits of Client 15's 2014 tax return, did

corruptly endeavor to obstruct and impede the due administration of the internal revenue laws,

that is, the audit of Client 15's tax return, by committing and causing to be committed various acts, each having a nexus to the IRS audit of Client 15,  including but not limited to: (a) providing false documents in connection with the examination and (b) making false statements in connection with the examination.

All in violation of 26 U.S.C. § 7212(a).

### Count Thirty
*Corrupt Endeavor to Obstruct or Impede the Administration of the Internal Revenue Code*
(26 U.S.C. § 7212(a))

151.    The Grand Jury realleges and incorporates by reference the factual allegations in paragraphs 1 through 42 of this Indictment.

152.    In or about 2015 and 2016, **MEYER** marketed and sold the Ultimate Tax Plan for Client 16.

153.    On or about April 15, 2016, **MEYER** created a promissory note, backdated to December 31, 2015, which he provided to Client 16 for signature.  **MEYER** created an appraisal, backdated to January 31, 2016, that purportedly valued Client 16's purported 2015 donation.

154.    On or about April 18, 2016, **MEYER** prepared and provided to Client 16 an Appraisal Form 8283 for tax year 2015 that falsely stated that Client 16 made a charitable contribution on December 31, 2015, valued at $1,181,668.  **MEYER** falsely declared on the Form 8283 that he was a qualified appraiser and falsely certified that the appraisal fees were not based on a percentage of the appraised property value.

155.    Based on the false Appraisal Form 8283, on or about August 17, 2016, **MEYER** assisted Client 16 in filing a false 2015 Form 1040 for Client 16 and his wife claiming a $1,181,668 charitable contribution tax deduction.

156.    On or about October 20, 2016, the IRS informed Client 16 that his 2015 individual income tax return was selected for audit and the assigned IRS Revenue Agent sought information regarding, among other things, Client 16's purported noncash charitable deduction.

157.    On or about October 25, 2016, **MEYER** sent an unsigned written acknowledgement letter to Individual B to sign on behalf of IEFund.  The written acknowledgement letter was backdated to January 10, 2016.  Individual B signed the letter and sent it to **MEYER**.

158.    On or about October 26, 2016, **MEYER** provided false statements and documents to Client 16's accountant who, at **MEYER's** direction, forwarded the statements and documents to the IRS Revenue Agent in response to the IRS's information document request.  The false documents included the backdated promissory note, backdated written acknowledgement letter, and other backdated documents that purported to establish that Client 16 had completed the charitable contribution donation in 2015.  **MEYER** also falsely claimed that Client 16 had completed the transaction in 2015.

159.    In or about May 2017, Client 16 hired Attorney 2 to represent him in the IRS audit.

160.    From on or about October 20, 2016, through in or about May 2, 2017, in the Southern District of Florida and elsewhere, the defendant,

**MICHAEL L. MEYER,**

knowing of and reasonably foreseeing the IRS's audit of Client 16's 2015 tax return, did corruptly endeavor to obstruct and impede the due administration of the internal revenue laws, that is, the audit of Client 16's tax return, by committing and causing to be committed various acts, each having a nexus to the IRS audit of Client 16,  including but not limited to: (a)

providing false documents in connection with the examination and (b) making false statements in connection with the examination.

All in violation of 26 U.S.C. § 7212(a).

**Count Thirty-One**
*Corrupt Endeavor to Obstruct or Impede the Administration of the Internal Revenue Code*
(26 U.S.C. § 7212(a))

161.    The Grand Jury realleges and incorporates by reference the factual allegations in paragraphs 1 through 42 of this Indictment.

162.    In or about October 2010, **MEYER** and others promoted and sold the Ultimate Tax Plan to Client 17 and informed Client 17, among other things, that Client 17 would retain control over his assets transferred to the Entity, Client 17 and his heirs could continue to access the donated assets tax free, Client 17 would receive a significant charitable tax deduction, and Client 17 could unravel the plan after a few years.

163.    To execute the Ultimate Tax Plan, Client 17 transferred real estate and interests in closely held corporations to Client 17's Entity and then assigned his units in the Entity to Grace Heritage.  Client 17 took an initial charitable deduction on his 2010 federal income tax return in the amount of $2,068,903 and carried forward unused portions of the tax deduction to his 2011 through 2015 tax returns.  Client 17 operated his real estate and interests in the corporations in substantially the same way both before and after the purported donation.

164.    On or about February 24, 2012, the IRS audited Client 17's 2010 federal income tax return and the assigned Revenue Agent requested information about the purported charitable deduction.

165.    On or about April 20, 2012, **MEYER** misrepresented to the IRS that he relied upon comparable sales data and an article when he prepared his appraisal in 2011 even though

Client 17 had just provided those items to **MEYER**.  **MEYER** did not provide the IRS with the promotional and marketing material provided to Client 17 regarding the Ultimate Tax Plan.

166.  On or about April 25, 2012, the IRS allowed the deduction.

167.  In 2016, Client 17 claimed a second tax deduction in the amount of $311,100 in connection with the Ultimate Tax Plan.

168.  In February 2017, **MEYER** prepared and provided to Client 17 an Appraisal Form 8283 for tax year 2016 that falsely reported that Client 17 made a charitable contribution on December 31, 2016, valued at $311,100.  **MEYER** falsely declared on the Form 8283 that he was a qualified appraiser and falsely certified that the appraisal fees were not based on a percentage of the appraised property value.

169.  On or about May 13, 2017, based on the Appraisal Form 8283, **MEYER** assisted Client 17 in filing a 2016 federal income tax return that falsely claimed a $311,100 charitable contribution tax deduction.

170.  On or about April 19, 2017, the IRS contacted Client 17 and informed him that the IRS was auditing Client 17's 2013 and 2014 federal income tax returns and the noncash charitable contributions tax deductions that Client 17 carried forward. The IRS requested information regarding the contributions.

171.  On or about September 11, 2017, the IRS informed Client 17 that the IRS was expanding its audit to include Client 17's 2015 and 2016 federal income tax returns.

172.  On or about September 29, 2017, the IRS requested from Client 17 information regarding the noncash charitable contribution tax deductions claimed in 2015 and 2016.

173.  On or about October 30 and 31, 2017, **MEYER** emailed to Client 17 issuance and assignment documents that were backdated to December 2016 and requested Client 17 to sign

the documents and send them to **MEYER**.  Client 17 signed the issuance and assignment documents and emailed them to **MEYER**.

174.    On or about November 3, 2017, **MEYER** responded to the IRS's requests for documents on behalf of Client 17 and provided backdated issuance and assignment documents, a backdated written acknowledgment letter, and a backdated appraisal report.

175.    On or about April 9, 2018, the IRS informed Client 17 and **MEYER** that the noncash charitable contributions were disallowed for the tax years 2013 through 2016 because the Ultimate Tax Plan had no economic substance, Client 17 did not actually transfer anything of value to charity, and the appraisal was not performed by a qualified appraiser.

176.    On or about June 18, 2018, **MEYER** filed a Protest Letter to challenge the results of the audit.  In that letter, **MEYER** made misrepresentations, including stating that "Meyer had no control over Grace and IEF", that "the charity stands to receive a staggering amount of money when this LLC dissolves upon the death of the taxpayer," and that "[t]he Taxpayers have not benefitted personally from these assets."  **MEYER** also falsely stated that he was a qualified appraiser.  **MEYER** misrepresented Client 17's intent in entering the Ultimate Tax Plan.

177.    From on or about April 19, 2017, through in or about June 18, 2018, in the Southern District of Florida and elsewhere, the defendant,

**MICHAEL L. MEYER**,

knowing of and reasonably foreseeing the IRS's audit of Client 17's 2011 through 2016 tax returns, did corruptly endeavor to obstruct and impede the due administration of the internal revenue laws, that is, the audit of Client 17's tax returns, by committing and causing to be committed various acts, each having a nexus to the IRS audit of Client 17,  including but not

limited to: (a) providing false documents in connection with the examination and (b) making false statements in connection with the examination.

All in violation of 26 U.S.C. § 7212(a).

**Count Thirty-Two**
*Conspiracy to Obstruct Justice*
(18 U.S.C. § 1512(k))

178.    The Grand Jury realleges and incorporates by reference the factual allegations in paragraphs 1 through 42 of this Indictment.

179.    From on or about May 23, 2018, through in or about April 26, 2019, in the Southern District of Florida and elsewhere, the defendant,

**MICHAEL L. MEYER,**

did knowingly combine, conspire, confederate, and agree with Fischel and others, known and unknown to the grand jury, to corruptly obstruct, influence, or impede an official proceeding, that is the civil lawsuit of *United States v. Michael L. Meyer*, 18-cv-60704 (S.D. Fla.), in violation of 18 U.S.C. § 1512(k).

180.    The manner and means by which the Defendant and his co-conspirators sought to accomplish the purpose of the conspiracy included, among other things, the following:

a.    Preparing and causing to be prepared backdated documents, including issuance documents, assignment documents, promissory notes, attorney engagement agreements, written acknowledgements, and appraisals;

b.    Causing clients to submit backdated documents to the United States in response to the civil subpoenas issued to the clients.

c.    Causing ACA to submit backdated documents in response to a civil subpoena issued by the United States.

34

d. Causing **MEYER** to submit backdated documents to the United States in response to document requests.

All in violation of 18 U.S.C. § 1512(k).

### Count Thirty-Three
*Tampering with Documents for Use in an Official Proceeding*
(18 U.S.C. § 1512(c)(2))

181.    The Grand Jury realleges and incorporates by reference the factual allegations in paragraphs 1 through 42 of this Indictment.

182.    From on or about May 23, 2018, through in or about April 26, 2019, in the Southern District of Florida and elsewhere, the defendant,

**MICHAEL L. MEYER,**

did corruptly obstruct, influence, or impede and did attempt to corruptly obstruct, influence, and impede, an official proceeding, that is the civil lawsuit of *United States v. Michael L. Meyer*, 18-cv-60704 (S.D. Fla.) through the following acts, among others:

a. **MEYER** prepared and caused to be prepared backdated documents, including issuance documents, assignment documents, promissory notes, attorney engagement agreement, written acknowledgements, and appraisals.

b. **MEYER** caused clients to submit backdated documents to the United States in response to the civil subpoenas issued to the clients.

c. **MEYER** caused ACA to submit backdated documents in response to a civil subpoena issued by the United States.

d. **MEYER** prepared and caused to be submitted backdated documents to the United States in response to document requests.

All in violation of 18 U.S.C. § 1512(c)(2).

**Count Thirty-Four**
*Criminal Contempt*
(18 U.S.C. § 401(3))

183.   The Grand Jury realleges and incorporates by reference the factual allegations in paragraphs 1 through 42 of this Criminal Indictment.

184.   On or about April 19, 2019, **MEYER** signed a Stipulation for Entry of Final Judgment of Permanent Injunction Against Defendant Michael Meyer in *United States v. Michael L. Meyer*, 18-cv-60704, ECF No. 95-1 (S.D. Fla.).

185.   On or about April 26, 2019, in the United States District Court for the Southern District of Florida, U.S. District Judge Beth Bloom entered a Final Judgment of Permanent Injunction Against Defendant Michael Meyer (the "Permanent Injunction") in *United States v. Michael L. Meyer*, 18-cv-60704, ECF No. 97 (S.D. Fla.) that permanently barred **MEYER** from, among other things, directly or indirectly:

a.   Organizing (or assisting in the organization of), promoting, marketing, or selling the Ultimate Tax Plan or any plan or arrangement that is substantially similar;

b.   Making or furnishing any statements about the tax benefits of the Ultimate Tax Plan;

c.   Furnishing tax advice regarding charitable contributions;

d.   Preparing (or assisting others in preparing) appraisals in connection with any federal tax matter;

e.   Acting as a federal tax return preparer, or filing, assisting in, or directing the preparation or filing of federal tax returns, amended tax returns, or other related documents or forms for any person or entity; or

f.   Advising, performing work for, or receiving compensation from Compassion Beyond Borders, Inc.

186.   The Permanent Injunction also required **MEYER** to unwind the Ultimate Tax Plan by either (a) causing NEA, Grace Heritage, IEFund, IEFoundation, and Indiana Outreach

Fund, Inc. to return the interest in the Entities back to the individuals who assigned, donated, contributed, or transferred those interests; or (b) causing NEA, Grace Heritage, IEFund, IEFoundation, and Indiana Outreach Fund, Inc. to disclaim any interest in the Entities.

187.   From on or about April 26, 2019 through June 29, 2023, in the Southern District of Florida and elsewhere, the defendant,

**MICHAEL L. MEYER**,

did knowingly and willfully disobey and resist the lawful order of a Court of the United States, namely, the Permanent Injunction in the case of *United States v. Michael L. Meyer*, 18-cv-60704 (S.D. Fla.), by:

a.   assisting in the preparation and filing of a Form 990 for CBB for tax year 2018;

b.   assisting CBB in responding to an IRS audit;

c.   assisting in the preparation and filing of a Form 990 for IEFoundation for tax year 2018;

d.   assisting Client 1 in preparing his 2020 federal income tax return by preparing and providing to Client 1 a Schedule K-1;

e.   preparing and signing Appraisal Forms 8283 for clients to file 2018 tax returns that claimed charitable contribution tax deductions for clients;

f.   causing Individual B to sign Appraisal Forms 8283 and providing those forms to clients to file 2018 tax returns that claimed charitable contribution tax deductions;

g.   preparing tax documents, including annual partnership tax returns and Schedule K-1 filings and annual reporting to the charities that owned each Entity;

h.   directing and assisting others to have clients transfer ownership interest in their Entities to Charity 1;

i.      making or furnishing any statements about the tax benefits of the Ultimate Tax Plan; and

j.      furnishing tax advice regarding charitable contributions.

All in violation of 18 U.S.C. § 401(3).

## Forfeiture

188.    Upon conviction of any of the violations alleged in Count Two, the defendant, **MEYER**, shall forfeit to the United States, pursuant to Title 18 United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of the aforestated offenses in paragraphs 129 through 132, including, but not limited to, a monetary judgment.

189.    If the property described above as being subject to forfeiture, as a result of any act or omission of the defendant,

a.  cannot be located upon the exercise of due diligence;

b.  has been transferred or sold to, or deposited with, a third party;

c.  has been placed beyond the jurisdiction of the court;

d.  has been substantially diminished in value; or

e.  has been commingled with other property which cannot be divided without difficulty;

the United States intends, pursuant to Title 21 United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other property of **MEYER** up to the value of the above forfeitable property.

A TRUE BILL

FOREPERSON

DAVID A. HUBBERT
Deputy Assistant Attorney General
U.S. Department of Justice, Tax Division

By: _____
MICHAEL C. BOTELER
Assistant Chief
CASEY S. SMITH
ANDREW P. ASCENCIO
Trial Attorneys
Department of Justice, Tax Division

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

UNITED STATES OF AMERICA

CASE NO.: 23-Cr-60129-KMM

v.

MICHAEL L. MEYER,

_____/
Defendant.

**CERTIFICATE OF TRIAL ATTORNEY**

**Superseding Case Information:**
New Defendant(s) (Yes or No) _____
Number of New Defendants _____
Total number of counts _____

**Court Division** (select one)
☐ Miami   ☐ Key West   ☐ FTP
☒ FTL   ☐ WPB

I do hereby certify that:

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. §3161.

3. Interpreter: (Yes or No) No
   List language and/or dialect: _____

4. This case will take __15__ days for the parties to try.

5. Please check appropriate category and type of offense listed below:

   (Check only one)                    (Check only one)
   I   ☐ 0 to 5 days          ☐ Petty
   II  ☐ 6 to 10 days         ☐ Minor
   III ☒ 11 to 20 days        ☐ Misdemeanor
   IV  ☐ 21 to 60 days        ☒ Felony
   V   ☐ 61 days and over

6. Has this case been previously filed in this District Court? (Yes or No) No
   If yes, Judge _____ Case No. _____

7. Has a complaint been filed in this matter? (Yes or No) No
   If yes, Magistrate Case No. _____

8. Does this case relate to a previously filed matter in this District Court? (Yes or No) Yes
   If yes, Judge Ruiz _____ Case No. 22-CR-60225

9. Defendant(s) in federal custody as of _____

10. Defendant(s) in state custody as of _____

11. Rule 20 from the _____ District of _____

12. Is this a potential death penalty case? (Yes or No) No

13. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard? (Yes or No) No

14. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss? (Yes or No) No

15. Did this matter involve the participation of or consultation with now Magistrate Judge Eduardo I. Sanchez during his tenure at the U.S. Attorney's Office, which concluded on January 22, 2023? No

By: _____

MICHAEL C. BOTELER
DOJ Trial Attorney
Court ID No.   A5502356

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## PENALTY SHEET

**Defendant's Name**: _____ MICHAEL L. MEYER _____

**Case No**: _____

Count #: 1

18 U.S.C. § 371

Conspiracy to Defraud the United States
* **Max. Term of Imprisonment:** Five (5) years
* **Mandatory Min. Term of Imprisonment (if applicable):** n/a
* **Max. Supervised Release:** Three (3) years
* **Max. Fine:** $250,000

Count #: 2

18 U.S.C. § 1349

Mail and Wire Fraud Conspiracy
* **Max. Term of Imprisonment:** Twenty (20) years
* **Mandatory Min. Term of Imprisonment (if applicable):**
* **Max. Supervised Release:** Three (3) years
* **Max. Fine:** $250,000

Counts #: 3 - 28

26 U.S.C. § 7206(2)

Aiding and Assisting in the Preparation of False Tax Returns
* **Max. Term of Imprisonment:** Three (3) years
* **Mandatory Min. Term of Imprisonment (if applicable):**
* **Max. Supervised Release:** One (1) year
* **Max. Fine:** $250,000

**\*Refers only to possible term of incarceration, supervised release and fines.   It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

<u>PENALTY SHEET</u>

**Defendant's Name**: _____ MICHAEL L. MEYER _____

**Case No**: _____

Counts #: 29 - 31

<u>26 U.S.C. § 7212(a)</u>

<u>Corrupt Endeavors</u>
* **Max. Term of Imprisonment:** Five (5) years
* **Mandatory Min. Term of Imprisonment (if applicable):**
* **Max. Supervised Release:** Three (3) years
* **Max. Fine:**   $250,000

Count #: 32

<u>18 U.S.C. § 1512(k)</u>

<u>Conspiracy to Obstruct</u>
* **Max. Term of Imprisonment:** Twenty (20) years
* **Mandatory Min. Term of Imprisonment (if applicable):**
* **Max. Supervised Release:** Three (3) year
* **Max. Fine:**   $250,000

Count #: 33

<u>18 U.S.C. § 1512(c)</u>

<u>Obstruct</u>
* **Max. Term of Imprisonment:** Twenty (20) years
* **Mandatory Min. Term of Imprisonment (if applicable):**
* **Max. Supervised Release:** Three (3) year
* **Max. Fine:**   $250,000

**\*Refers only to possible term of incarceration, supervised release and fines.   It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.**

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

<u>PENALTY SHEET</u>

**Defendant's Name**: _____<u>MICHAEL L. MEYER</u>_____

**Case No**: _____

Count #: 34

<u>18 U.S.C. § 403(3)</u>_____

<u>Criminal Contempt</u>_____
* **Max. Term of Imprisonment:** Fine or imprisonment or both at the Court's discretion
* **Mandatory Min. Term of Imprisonment (if applicable):**
* **Max. Supervised Release:**
* **Max. Fine:**

**\*Refers only to possible term of incarceration, supervised release and fines.   It does not include
restitution, special assessments, parole terms, or forfeitures that may be applicable.**