UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.   23-CR-60129-KMM

UNITED STATES OF AMERICA

   v.

MICHAEL L. MEYER

   **Defendant.**
_____/

SENTENCING MEMORANDUM AND
RESPONSE TO DEFENDANT'S OBJECTIONS TO THE PSR

"[I]t is not an ultimate plan – it is just a tax scam."[1] That is how a Forbes article published in November 2013 described Michael Meyer's "Ultimate Tax Plan."

For over two decades, defendant Michael Meyer used his skills as an attorney and certified public accountant to promote his fraudulent tax shelter called "The Ultimate Tax Plan." Meyer pitched his plan to high-income clients who wanted to pay substantially less taxes. Myer marketed his scheme as a way to claim a charitable contribution tax deduction without ever giving up control and use of the "donated" assets. This was simply fraud disguised as an act of charity, and Meyer knew it. Meyer was richly rewarded for selling this illegal tax shelter and lived a lavish lifestyle that included a million-dollar home and expensive cars, such as Lamborghinis, a Rolls Royce, and a Bently. Meyer's clients claimed millions in false tax deductions which resulted in enormous tax losses to the United States.

In an effort to shut down the shelter, the IRS conducted several audits of Meyer's charities. As part of dissolving Meyer's charities, the IRS found and Meyer signed documents

---

[1] EX A, Forbes, "Identical Twins: The LLC-2 Tax Shelter Takes Over Where the SC-2 Tax Shelter Left Off" at 6 (Nov. 24, 2013).

acknowledging, that the Ultimate Tax Plan was an economic sham. However, Meyer was undeterred. He simply created new "charities" and continued to fleece the government by promoting his illegal shelter to wealthy taxpayers. Indeed, when several of his clients were audited by the IRS, Meyer lied to the IRS to conceal the nature of his plan. And when the Department of Justice sued Meyer for an injunction barring him from promoting his scheme, Meyer and his co-conspirators directed clients to sign backdated documents in an attempt to substantiate his plan.

The government has identified tens of millions of dollars in loss to the United States Treasury caused by just thirty-nine of Meyer's clients. Given Meyer's long-standing obstructive and criminal conduct and his abuse of his law license, the United States respectfully requests that the Court sentence Meyer to a term of imprisonment of no less than 96 months.

## BACKGROUND

Meyer's criminal and obstructive conduct spans decades. The United States submits this sentencing memorandum to highlight the particularly abusive aspects of Meyer's plan and his knowledge that he was perpetuating a fraud.

### A. The Ultimate Tax Plan

The Ultimate Tax Plan purportedly worked as follows. Meyer used boilerplate transaction documents for his clients to execute the following steps:

1. Meyer formed an LLC for the client;
2. The client transferred an asset to the LLC in exchange for 100% ownership of the LLC;
3. The client donated 99% or 100% of that ownership interest to a charity controlled by Meyer or his co-conspirators; and
4. The client received an IRS Form 8283 (Noncash Charitable Contribution) signed by Meyer allowing them to claim a charitable contribution tax deduction.

The Client "donated" their ownership interest in an LLC to claim a charitable contribution tax deduction on their tax return and thereby shelter a substantial portion of their income from taxes. But, per the terms of the LLC's operating agreement, written by Meyer, the client retained

total control of all of the assets in the LLC as the LLC's manager. (Presentence Investigation Report ("PSR") ¶ 31-32). Because the donations of LLC units were considered non-cash contributions, to support the claimed tax deduction, the clients needed an appraisal of the "donated" asset prepared by a qualified appraiser. 26 U.S.C. §170(f)(11). Meyer prepared these appraisals for clients, and on the sworn appraisal form, falsely represented that he was independent of the transaction and that his fee was not based on a percentage of the appraised property value.[2]

The transfer of client assets to the LLCs was a sham. To the extent clients actually contributed assets to the LLCs, Meyer advised them that they could move the assets back into their names by loaning money from the LLC to themselves or by buying back their assets for mere pennies on the dollar.

Meyer's plan required charities that would accept these LLC units as contributions. (PSR ¶37-40). Few, if any, legitimate charities would accept a contribution of LLC units from clients who maintain total control of all the assets in the LLC. Thus, in 1999, Meyer created a nonprofit entity called National Endowment Association, Inc. ("NEA"). Meyer enlisted his parents as the initial officers of NEA. In 2007, Meyer created a new nonprofit entity called Grace Heritage Corporation ("GHC"), and again he reported his parents as the initial officers. In 2012, Meyer created a third nonprofit entity called Indiana Endowment Fund ("IEFund"). Meyer reported a nominee he had met through his church as the President of IEFund. However, in reality, at all times, Meyer controlled these entities, and the nominal directors merely signed documents at Meyer's direction.

Each of these charities was audited in turn, and the IRS revoked their charitable designations as a result of the audits. Meyer signed the IRS Closing Agreements that revoked the

---

[2] Ex. B, Tax Year 2015 Form 8283 signed by Meyer August 18, 2016.

entities' tax-exempt status which included the following language:

> "[O]ne of the purposes of [NEA] was to enable Michael L. Meyer to promote a tax planning strategy using charitable deductions . . . Meyer and others promoted the use of purported transfers/donations of various business and property interests, including limited partnerships and limited liability companies, to [NEA], by the transferors/donors of those interests . . . [T]he Internal Revenue Service determined that little or no actual economic benefits were transferred to [NEA] as a result of the purported transfers/donations . . . [T]he Internal Revenue Service determined that the income expenses, deductions, or losses, reported to [NEA] . . . with respect to purported transfers/donations to [NEA] were taxable." [3]

On May 16, 2014, Meyer signed the closing agreement for NEA. On May 19, 2017, Meyer signed substantially similar agreements on behalf of GHC and IEFund. Undeterred by the IRS, Meyer persisted in promoting his illegal scheme. And in 2016, he created a new nonprofit called Indiana Endowment Foundation ("IEFoundation"), with the same nominee president as IEFund.

Meyer also instructed his financial planner co-conspirators to create their own "charities" to be used in the scheme. Coconspirator Rao Garuda pleaded guilty in the Northern District of Ohio and admitted to conspiring with Meyer and preparing false tax returns for clients.[4] Meyer assisted Garuda in forming his own charity, Compassion Beyond Borders, Inc. ("CBB") and instructed him on how to deceive the IRS into granting it tax exempt status:

> "You will need to tell the agent WHAT the purpose of [CBB] is. Do not get into the LLCs or our plan. Just explain the purpose of the organization and how it will benefit the public."[5]

Like all of Meyer's charities, the purpose of CBB was to enable tax fraud.

**B. Meyer Ignored All Warnings**

Over the years, Meyer ignored a chorus of people who told him that his plan was illegal—including IRS employees, CPAs, attorneys, and even a Forbes contributor. As described above,

---

[3] EX C, NEA Closing Agreement signed May 16, 2014.
[4] *United States v. Rao Garuda*, 1:23-CR-00327-BMB (Northern District of Ohio).
[5] EX D, Email dated April 18, 2016 from Meyer to Garuda

4

Meyer was put on notice by the IRS that his plan was smoke and mirrors when the IRS disqualified his charities from tax-exempt status. Meyer's clients were also audited by the IRS. Meyer was fully aware of his client audits because he represented many of them as power of attorney ("POA") during those IRS audits. Over and over, the IRS disallowed the false charitable deductions claimed by Meyer's clients. In an IRS Appeals Officer's memo disallowing Meyer's plan and recommending penalties against the client for substantially understating their income as part of Meyer's plan, the IRS stated:

> "The original conference on this case was rather lengthy as I discussed the contribution issue at length with POA Meyer. I informed the POA that Appeals agrees with the government on that issue. Dominion and control over the partnership interest was not relinquished to NEA."[6]

Moreover, a tax attorney for Client 7[7] stated "[i]n my opinion, the transaction is <u>clearly fraudulent</u> and will not withstand scrutiny from the IRS for a whole host of reasons" (emphasis added) including the client's continued control of the assets and Meyer's inability to act as an independent qualified appraiser for the transaction.[8] The tax attorney spoke directly to Meyer and once again stated that the plan would not pass IRS review and that they "would regret being involved in the plan." In a letter addressed to Meyer by another client's attorney, the attorney stated "this plan appears to present highly-aggressive sales techniques, over-reaching in references to authorities, and miss-state or stretch . . . what several of the claimed authorities present."[9]

Nevertheless, despite knowing that he was peddling a fraudulent scheme, Meyer was undeterred. Indeed, Meyer's plan grew so notorious in the tax community that it received criticism

---

[6] EX E, Appeals Transmittal and Case Memo dated September 13, 2013, at 8.
[7] The clients identified by number in this Memorandum correspond with the clients identified by number in the Indictment (ECF 1) and the PSR.
[8] Ex F, Email to Meyer dated January 31, 2017.
[9] Ex G, Letter to Meyer dated February 10, 2011.

in Forbes, with the writer recognizing and labelling the Meyer plan as "an illegal tax shelter."[10]  In response, Meyer denounced the journalist as "clearly ignorant" and assured his coconspirators that "there is [a] right way to do this to avoid scrutiny."[11] Meyer disregarded all the warnings for the same reason that he frequently disregarded the rules of his own plan: he was greedy. He was making money off the plan and would continue to do so regardless of the law.

### C. The Abusive Nature of the Ultimate Tax Plan

Meyer's plan was aggressive in theory and was an abusive fraud in practice.  Meyer explained how his clients could exit the plan and evade a tremendous amount in income taxes:

> "[T]the charity is basically controlled by us. So we understand how this works and we understand what we need to do in order to make that work . . . So if you got $1 million in there and you want to buy it back, it's going to cost you $100,000. Now, you'll probably save yourself $300,000 or $400,000 in income tax when you put the $1 million in there, right, because you got the tax deduction. So it's always a win-win, you know, for you and our charity at the same point in time."[12]

The plan was a win for the wealthy clients and Meyer.  But, it was not a win for the citizens of the United States.

### i. *Promissory notes and backdating to further the fraud scheme*

It does not take a JD or CPA to know that taxpayers cannot claim deductions today based on promises to donate to a charity at some unknown future date.  But promissory notes had a clear advantage for Meyer.  Meyer could write whatever date he wanted on the promissory notes he created.  This abuse of promissory notes and backdating allowed Meyer to pitch his plan to clients for tax years that had already passed and were closed.  Indeed, some clients could evade their income tax liability for the year prior to even meeting Meyer or hearing of his tax shelter plan, as

---

[10] EX A.
[11] EX H, Email to Garuda dated March 24, 2014.
[12] Ex I, Recorded Call undated, at 9.

demonstrated on a call with Client 1 on August 9, 2017:

> GARUDA: "Okay, Michael. [Client 1] needs the deduction for 2016. So, you know, he – you have to explain to him how you get that?"
>
> MEYER: "Yeah. So we already have an LLC set up, 2016 LLC, you basically will just sign a promissory note to the LLC. The LLC then will basically have a date on '16."[13]

From Meyer's perspective, another advantage of using promissory notes in his scheme was that clients did not need to immediately put up any cash or assets to claim the charitable tax deduction. Meyer maximized the potential for abuse, as demonstrated with Client 6. When Meyer was informed in 2016 Client 6 had never actually paid the $500,000 promissory note that was the basis of his 2012 tax year charitable contribution deduction, Meyer was unfazed and replied "2015 Notes that have not been paid off are a little concerning. [Client 6] is past his statute so I am not really worried about him." [14] Of course, Meyer was referring to the three-year statute of limitations for the IRS to audit most taxpayer's personal income tax returns. Avoiding IRS scrutiny during this three-year period was key to his scheme and also important to the exit strategy Meyer pitched to his clients.

### ii.    *Loans and Buybacks - More Smoke and Mirrors*

A key part of the illegal tax shelter was that Meyer structured the plan to allow and encourage his clients to use the "donations" for their own personal use. Meaning that the client actually never "donated" the contribution. Meyer pitched two options that allowed his clients to reclaim all, or the vast majority of the funds they had "donated:" (1) loan the money in the LLC back to themselves or (2) buy back their interest in the entity from the charity – generally at 10 percent of its value.

---

[13] EX J, Recorded Call dated August 9, 2017, at 9-10.
[14] EX K, Email to Meyer dated December 19, 2016.

7

To preserve the illusion that this was a charitable contribution and thus avoid IRS scrutiny, Meyer insisted clients wait to reclaim their funds until after the audit window had passed:

> "The IRS statute of limitations is 3 years from the date you file your return with the deduction claimed . . . So, the policy is for you to contribute to the LLC when you are making the income and do not want to pay the tax and, after this time, to begin taking loans a few years after."[15]

Client 4 illustrates the strategy in practice. After contributing $1.3 million to an account in the name of the LLC that Client 4 had purportedly donated to charity to claim a substantial income tax deduction on his tax return, Client 4 then withdrew over $1 million from that account as "loans to himself" for expenses including home renovations, an inground swimming pool, and ATVs. (PSR ¶65).

Meyer implemented the same three-year rule with respect to buybacks – "[y]ou wouldn't want to buy these units back from the charity until you have your statute passed on your deductions."[16] Meyer had this rule because he knew that allowing a client to buy back their interest in an LLC donated to charity was illegal and stated as much in a 2016 deposition:

> "[I]f a charity prearranges or there's an understanding or even an expectation maybe that somehow they are going to be able to buy back this interest or obtain this interest back for less, and maybe substantially less, then the interest that was gifted over to the charity, then to me that would be abusive."[17]

But Meyer used these buybacks as a method of returning assets to clients while simultaneously lining his own pockets. Meyer entered into a written buyback agreement with Client 9 to return their LLC interest for 15% of the LLC's assets.[18] On April 20, 2019, one day after Meyer signed a stipulation for entry of the permanent injunction against him, Meyer executed the buyback by transferring Client 9's LLC ownership from IEFoundation to his law firm –signing on behalf of

---

[15] EX L, Email to Garuda dated September 9, 2016.
[16] EX I at 10.
[17] EX M, Deposition of Michael L. Meyer dated April 26, 2016, at 95-96.
[18] EX N, Buy-Sell Agreement dated May 21, 2014.

the charity in lieu of his nominee – and directed to himself $224,000 of the $225,000 in funds that Client 9 paid to reclaim their LLC interest. (PSR ¶98-100). Meyer, greedy to the end, was not interested in funding charity, but instead lining his own pockets.

### iii. *Illegally Backdating documents in response to the Civil Injunction Suit*

On April 3, 2018, the Department of Justice filed a Complaint for Permanent Injunction against Meyer in the United States District Court for the Southern District of Florida. The government issued civil subpoenas to some of Meyer's clients and financial planning coconspirators. (PSR 118).

Meyer and his coconspirators knew that the transaction documents that were subject to subpoena did not exist. So they set about creating documents and directing clients to sign the newly created backdated documents. Meyer warned a coconspirator that the government would compel production of Meyer's emails. So, in anticipation of the government's subpoena, they sent backdated documents by U.S. mail, and later, via a second email address Meyer created to conceal this activity from the government. (PSR 119-125). Meyer sent dozens of unsigned transaction documents using his alternate email for clients to sign backdated in response to the government's subpoenas.[19]

On April 26, 2019, United States District Judge Beth Bloom entered a Final Judgement of Permanent Injunction against Meyer which barred him from, among other things, promoting his plan and performing work for individuals in connection with contributions to named tax exempt entities. In response, Meyer stopped pitching the plan to new clients, but he continued to prepare tax documents for clients in exchange for fees to facilitate his clients' continued use of his plan.[20]

---

[19] EX O, Email to Tara Cacy dated August 27, 2018.
[20] EX P, Email dated April 5, 2021; Exhibit Q. Invoice dated January 11, 2020.

### D. Meyer caused substantial Harm to the United States and Lined his Pockets

The tax loss calculation presented in the PSR is based on the government's analysis of only thirty-nine of Meyer's clients. Meyer frequently boasted of doing the transaction hundreds of times,[21] and in response to a civil interrogatory, he identified over 150 clients from whom he received fees between 2013 and 2017. Thus, this tax loss calculation captures just a sliver of the damage Meyer caused to the United States. Meyer aided these thirty-nine clients in claiming $69,465,938.68 in fraudulent charitable contribution tax deductions on their tax returns filed with the IRS. These false tax returns caused an intended tax loss of $20,205,512.99.

Of course, Meyer charged a substantial fee to help his clients evade their income taxes. His fee was based on a percentage of the tax savings – generally six percent of first $1 million in assets flowing through the plan and four percent thereafter.[22] This flow is demonstrated in the attached Exhibit R, where the client ran $1.1 million through the plan for approximately $350,000 in tax savings in exchange for $64,000 in fees to Meyer.

Meyer used his millions in ill-gotten gains to surround himself in opulence and luxury. He purchased multimillion-dollar homes and eye-catching luxury vehicles – including a 2014 Rolls Royce Wraith, 2008 Mercedes Benz S550, 2011 Bently Continental, 2013 Ferrari F12, 2005 Dodge Viper, 2016 Infiniti QX80, 2011 Rolls Royce Ghost, 2013 Mercedes Benz S550, 2005 Lamborghini Murciélago, 2003 Chevrolet Corvette, 2005 Mercedes Benz SL 600, and a 2001 Lamborghini Diablo. (PSR 235-237, 244).

### PROCEDURAL BACKGROUND

On June 29, 2023, the grand jury returned a thirty-four-count Indictment against Meyer.

---

[21] EX H, Email to Garuda dated March 24, 2014 ("I have done 350+ transactions" in the last sixteen years")
[22] EX R, Meyer Invoice dated December 31, 2016.

(ECF 1). On January 17, 2024, the government filed a two-count Superseding Information against Meyer. (ECF 52). Meyer pleaded guilty to the Superseding Information pursuant to a plea agreement. (ECF 57).

## RESPONSE TO DEFENDANT'S OBJECTIONS TO THE PSR

The Government's response to the Defendant's objections to the PSR are as follows:

- **Paragraph 259**: Defendant denies the tax loss in this case reached $20,205,512.99 without explaining what, if any, errors are present in the Government's calculations. The Government's calculations gave credit to Meyer for instances in which the thirty-nine clients gave money to real charities and is entirely limited to thirty-nine clients. For these reasons, the Government disputes Defendant's denial the tax loss reached $20,360,783.

- **Paragraph 1:** The Government concurs.

- **Paragraph 33:** The Government would further clarify that the opinion letter referenced was not addressed to Meyer and was revoked shortly after issuance. Meyer never received an independent opinion letter validating the plan. To the extent Meyer ever had clients that received no-change letters from the IRS, the Government would direct the Court's attention to paragraphs 133-167 of the PSR which describe Meyer's repeated efforts to deceive the IRS about the nature of his plan on behalf of multiple clients.

- **Paragraph 40**: For fuller context to Meyer's claim that over the course of his scheme his charities distributed $32 million nationwide, the Government would direct the Court to the attached 2017 Form 990 for IEFoundation prepared by Meyer which reports that the charity had made $2.9 million in grants that year compared to its $205 million in LLC unit assets.[23] Likewise, the attached 2017 Form 990 for CBB reported that the charity made $2,425 in

---

[23] EX S, 2017 IRS Form 990 for Indiana Endowment Foundation (PP. 10, 23).

11

grants compared to its $10 million in LLC assets.[24] This is consistent with Meyer's exhortations to clients that they donate 1% of the value of their LLCs to a real charity to preserve the illusion the transaction had a non-fraudulent purpose.

- **Paragraph 41**: Meyer claims that Client 6 was his only client who failed to pay a backdated promissory note within two years. This is false. Of just the clients identified in the original Indictment, Client 14 never paid the promissory note and never even opened a bank account for his LLC.[25] Client 10 only paid his promissory note for tax year 2015 when he received a civil subpoena from the Department of Justice in mid-2018.[26]

- **Paragraph 60:** The Government concurs.

- **Paragraph 67:** The Government concurs.

- **Paragraphs 99, 100, 113 and 114:** Meyer claims he arranged for Client 9 to buyback their LLC interest "to comply with (not violate) the permanent injunction." This is false. The permanent injunction ordered Meyer to cause his charities to assign the interests in their LLCs back to his clients or disclaim the charities' interests in the LLCs. The injunction further required Meyer to return the funds retained in the charities bank accounts to his clients in reverse chronological order to the clients from which the funds originated.[27] Meyer solicited the $225,000 buyback from Client 9 and directed the funds to himself days before the injunction's entry to avoid having to comply with the injunction – which would have forced him to return to Client 9 the LLC interest and any funds placed into the LLC's account. With respect to the $224,000 that was deposited into his personal bank account,

---

[24] EX T, 2017 IRS Form 990 for Compassion Beyond Borders.
[25] EX U, Client 14 MOI.
[26] EX V, Client 10 MOI.
[27] EX W, Final Judgement of Permanent Injunction against Defendant Michael Meyer ¶¶11-12.

the government does not see that money flowing to any charity. The $224,000 was deposited on May 2, 2019, into Meyer's bank account ending in 9935. That bank account does not show withdrawals that went to charities, but primarily personal expenses and money transferred to Meyer's wife. For instance, on May 7, 2019, an additional $70,000 was deposited into the account ending in 9935 and then $150,000 transferred to Meyer's wife's account ending in 5834. The account ending in 5834 shows a transfer on April 29, 2019, of $525,000 and on May 7, 2019, of $150,000. Both of those came from accounts ending in 9935. Meyer's wife then transferred $1.2 million to her TD Ameritrade account on September 20, 2019. There were no charitable withdrawals from the TD Ameritrade account. The money sat in that account until August 2020, when a series of withdrawals sent a portion to the Meyer's account ending in 2735. There do not appear to be charitable expenses from account ending in 2735. The Government does not see the allegedly $170,000 of charitable distributions flowing from Client 9's buyback.

- **Paragraph 132(a):** A Form 990 is a federal tax return that fell within the scope of the permanent injunction.

- **Paragraph 132(e):** Meyer claims he did not prepare or sign any Forms 8283 for clients to claim 2018 charitable contributions. This is false. See attached Exhibit X, an email dated September 19, 2020, in which Meyer requests the nominee president of his (shutdown) charity sign a tax year 2018 Form 8283 which Meyer himself signed and dated September 15, 2020.[28]

-  **Paragraph 132(g):** Meyer acknowledges preparing partnership returns on behalf of clients but claims because they were state rather than federal, his preparation of those

---

[28] EX X, Email dated September 19, 2020.

returns did not violate the permanent injunction. Meyer's preparation of state returns for clients who had participated in his scheme falls under the paragraph 5(n) of the permanent injunction which barred him from "advising, performing work for, or receiving compensation for work for individuals in connection with making assignments, donations, contributions, or transfers to" listed charities. Furthermore, see Exhibit P for one example of Meyer preparing a Federal Schedule K-1 (Form 1065) for one of his clients after the entry of the injunction.[29] The Schedule K-1 is used by the clients to prepare their federal tax returns.

- **Paragraphs 168, 169, 73, and 74:** The Government disputes this. See response regarding Paragraph 259 (tax loss) above.

- **Paragraph 193:** The Government takes no position.

## SENTENCING GUIDELINES

Pursuant to the plea agreement, the parties recommended the following Guidelines calculations which were adopted by Probation in the PSR:

| | |
|---|---|
| U.S.S.G. § 2T4.1(K) Base Offense Level | 26 |
| U.S.S.G. § 2T1.1(b)(1)(a) Substantial portion of income | +2 |
| U.S.S.G. § 2T1.1(b)(2) Sophisticated means | +2 |
| U.S.S.G. § 3B1.1(c) Organizer, supervisor | +2 |
| U.S.S.G. § 3E1.1 Acceptance of Responsibility | -3 |
| **Total** | **29** |

With a criminal history category of I, the guidelines imprisonment range is 87 to 108 months.

## RECOMMENDED SENTENCE

The nature and circumstances of the offense, the need to promote respect for the law, and to afford adequate deterrence, both specific and general, support a substantial prison sentence of

---

[29] EX P, Email dated April 5, 2021.

at least 96 months.

### A. The Nature of Meyer's conduct and Meyer's greed

Michael Meyer made a career out of using his professional training—including as a lawyer-- to organize, market, promote, and sell illegal and abusive tax shelters. Through this scheme, Meyer successfully fleeced the United States Treasury out of tens of millions of dollars. Meyer was not a misguided individual who took an aggressive but ultimately mistaken tax position. Meyer knew when he promoted his scheme that he was selling tax fraud disguised as an act of charity.

Meyer was given every opportunity to stop selling this tax shelter scheme. The IRS and other tax professionals warned Meyer what he was doing was illegal for more than a decade *before* the Department of Justice brought the injunction suit against him. In fact, almost the entirety of thirty-four-count Criminal Indictment and Superseding Information focuses on Meyer's promotion of his illegal tax shelter *after* he signed a closing agreement with IRS revoking his first charity's exempt status because it had no legitimate charitable purpose. Knowing that the IRS considered his "plan" to be nothing but an illegal tax shelter, Meyer brazenly continued to sell it. When the IRS shut down one charity, Meyer would simply create a new one. When one client refused to do the plan because an independent attorney told them it was clearly fraud, Meyer found another client who asked fewer questions when Meyer told them he could erase their income tax liabilities without giving up any assets.

Meyer was motived by voracious greed. As an attorney and certified public accountant, Meyer was fully aware of his crimes. Yet, he brazenly chose to use his skills and training to perpetuate a fraud that generated millions of dollars in fees. The imprimatur of his credentials gave Meyer's plan an air of legitimacy that was vital to convincing taxpayers across the country

15

to participate in his scheme. Such an abuse by a member of the bar demands a strong prison sentence.

### B. Heightened Need to Deter Meyer and Others

But for this indictment and criminal process, Meyer would still be engaged in promoting his tax fraud shelter. Meyer did not stop selling his illegal tax shelter when the IRS audited his clients, disallowed their claimed charitable deductions, and required them to pay penalties and interest. Meyer did not stop when the IRS shut down his charities. Meyer did not stop when he was sued civilly by the government. Meyer did not stop when he received subpoenas for documents in litigation—indeed, he responded by fabricating documents. Meyer did not stop even after a permanent injunction was entered against him in a United States District Court. Instead, he continued to prepare false tax documents for clients for fees.

The need for specific deterrence for Meyer is demonstrable. Most narcotics distributors do not receive multiple warnings from the United States government to stop their criminal conduct. But for Meyer, a highly trained CPA/attorney, the United States used every tool in its disposal to warn and stop him from promoting his illegal tax shelter. Instead of heeding these warnings, Meyer made greater efforts to conceal his activity from IRS scrutiny. Meyer instituted his three-year rule to conceal from the IRS that his clients were never giving up control of their "donated" assets. He used nominees in the charities he created after his first charities were shut down. He backdated documents. He opened a new email account. He worked harder to conceal his criminal fraud.

The IRS estimates that there was an average of $496 billion in unreported and uncollected taxes in each year from 2014-2016 – peak years of Meyer's scheme.[30] Law-abiding taxpayers incurred the effective equivalent of a $3,000 "surtax" per household to subsidize tax cheats.[31] As reflected in the disparity between the intended tax loss attributed to Meyer and the restitution still owed associated with his clients, the IRS has clawed back millions of dollars in unpaid taxes associated with Meyer's scheme. But the IRS will never be able to audit all of Meyer's clients – going back over twenty years – and law-abiding taxpayers are left footing the bill for Meyer's tax shelter.

Whether it's a labeled a charitable LLC, syndicated conservation easement, or private annuity plan, a fraudulent tax shelter is fraud. It is stealing from the United States. And, as in this case, professionals trade on their credentials to line their pockets with enormous fees generated by the fraud. Meyer's conduct shows that no IRS or civil penalty can fully deter this conduct. Even a permanent injunction entered by a United States District Court did not stop Meyer from preparing filings for his clients. A substantial prison sentence is necessary to deter Meyer, and to deter those who are tempted by greed to create and promote abusive and illegal tax shelters.

### C. Meyer caused Enormous Financial Harm to the United States

It goes without saying that tax offenses are serious, costly, and damaging to our nation's system of taxation. U.S.S.G. Ch. 2, Pt. T, intro. comment. For the thirty-nine clients forming the basis of the government's tax loss calculations alone, Meyer's plan fleeced the United States Treasury out of over $20 million and netted Meyer millions in fees. White-collar criminals "often

---

[30] *Federal Tax Compliance Research: Tax Gap Estimates for Tax Years 2014–2016*, Publication 1415 (Rev. 10-2022), pg. 20, *available at* https://www.irs.gov/pub/irs-pdf/p1415.pdf.
[31] *National Taxpayer Advocate 2020 Purple Book: Compilation of Legislative Recommendations to Strengthen Taxpayer Rights and Improve Tax Administration*, Publication 5286 (Rev. 12-2019), pg. 7.

17

calculate the financial gain and risk of loss" of their conduct. *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006). And Meyer was not an individual taxpayer choosing to evade his tax liabilities for one or even multiple years. Each of his clients represents his calculated decision to aid the evasion of taxes in exchange for fees. And each calculated decision occurred client after client, tax season after tax season, for more than ten years. Such conduct demands a substantial sentence. *See United States v. Kuhlman*, 711 F.3d 1321, 1329 (11th Cir. 2013) ("[B]ecause economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." (quotation marks and citation omitted)); *Martin*, 455 F.3d at 1240.

## RESTITUTION

Under the Mandatory Victim Restitution Act of 1996, restitution is mandatory for Meyer, who was convicted of 18 U.S.C. § 371. *See* 18 U.S.C. § 3663A. The United States calculates the restation due and owing as $12,136,014.34 based on the tax loss associated with the 39 clients less any amount recovered by the Government. Defendant has expressed their intent to request an opportunity to contest this figure and determine restitution at a later date. The Government does not oppose this request.

## CONCLUSION

For all the reasons set forth in this memorandum, the United States requests that the Court sentence Meyer to a term of imprisonment of no less than 96 months.

DAVID A. HUBBERT
Deputy Assistant Attorney General
U.S. Department of Justice, Tax Division

Dated: __04/04/24____                 _____/s/_____
                                      MICHAEL BOTELER
                                      Assistant Chief

18

ANDREW P. ASCENCIO
Trial Attorney
U.S. Department of Justice, Tax Division

**CERTIFICATE OF SERVICE**

It is hereby certified that the foregoing "GOVERNMENT'S SENTENCING MEMORANDUM" has been electronically filed and service has been made on opposing counsel by virtue of such electronic filing this 4th day of April, 2024 to:

> Jeffrey A. Neiman, Esq.
> Marcus Neiman & Rashbaum LLP
> 100 Southeast Third Avenue
> Suite 805
> Fort Lauderdale, FL 33394
> 954 462 1200

By: *s/Andrew P. Ascencio*
ANDREW P. ASCENCIO
District Court No. A5502950
Trial Attorney
U.S. Department of Justice
Tax Division
150 M St, NE
Washington, DC 20002
Telephone: 202-733-7241
Fax: 202-514-0961
E-mail: Andrew.Ascencio@usdoj.gov