UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-60129-CR-MOORE/Louis

UNITED STATES OF AMERICA,

     Plaintiff,

vs.

MICHAEL L. MEYER,

     Defendant.

_____/

## DEFENDANT'S SENTENCING MEMORANDUM AND MOTION
## FOR DOWNWARD VARIANCE FROM THE GUIDELINES

     Defendant Michael Meyer, through undersigned counsel, respectfully submits this memorandum in aid of sentencing and motion for downward variance, and states as follows:

### INTRODUCTION

     Michael Meyer, a loving husband and father of three children, one profoundly disabled, is scheduled to be sentenced by this Court on April 11, 2024, having pleaded guilty to a two-count Superseding Information charging him with conspiracy to defraud the United States in violation of 18 U.S.C. § 371, and tax evasion in violation of 26 U.S.C. § 7201. (DE 57). The Presentence Investigation Report ("PSI") has assigned him a total offense level of 29, which carries with it an advisory guidelines range of 87 to 108 months' imprisonment. PSI ¶ 189. Taking into consideration a variety of factors under § 3553 – namely (i) Mr. Meyer's extraordinary family circumstances as the father of three children, one of whom has low-functioning autism and requires 24-hour-a-day care; (ii) his decades-long record of service to his community; (iii) his acceptance of responsibility and assistance to the United States; (iv) the fact that his tax plan, improper though it was, generated

over $33 million in charitable donations; and (iv) his non-existent risk of recidivism – we respectfully urge this Court to impose a below Guidelines sentence in this case.

## **DISCUSSION**

### I.     CONSIDERATION OF THE 3553(A) FACTORS WARRANTS A DOWNWARD VARIANCE

The Supreme Court encourages sentencing courts to exercise discretion in imposing a just and fair sentence. *See, e.g.*, *Spears v. United States*, 555 U.S. 261, 264-65 (2009); *Rita v. United States*, 551 U.S. 338, 351 (2007); *Kimbrough v. United States*, 552 U.S. 85, 110-11 (2007); *United States v. Booker*, 543 U.S. 220, 245-46 (2005).  In the post-*Booker* era, a sentencing court's duty is to consider all of the factors identified in 18 U.S.C. § 3553(a) and "impose a sentence sufficient, but not greater than necessary" to comply with the four purposes of sentencing set forth in that statute.  Following *Booker*, district courts must impose a sentence in accordance with the factors set forth in § 3553(a), of which the advisory Guidelines "now serve as one fact among several courts must consider in determining an appropriate sentence." *Kimbrough*, 552 U.S. at 90.  A "sentencing judge may not perfunctorily impose a guidelines sentence or even presume that such a guidelines sentence is appropriate in a given case." *United States v. Warner*, 792 F.3d 847, 855 (7th Cir. 2015).

Section 3553 requires the sentencing court to consider a number of factors in imposing a sentence, including: (1) the nature and circumstances of the offense and history and characteristics of the defendant; (2) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (3) the need for the sentence to provide just punishment for the offense, afford adequate deterrence, and protect the public. Consideration of these factors militates in favor of a below guidelines sentence for Mr. Meyer.

*The History and Characteristics of the Defendant*

The first of the 3553(a) factors recognizes that a defendant's history and characteristics may support a downward variance and should be afforded the same weight as the nature and circumstances of the offense. *United States v. Rodriguez*, 724 F. Supp. 1118, 1119 (S.D.N.Y. 1989).

**1.   Mr. Meyer's Extraordinary Family Circumstances**

When it comes to Mr. Meyer's character, the letters from his friends and family paint a true picture of who Mr. Meyer is. His sister, Donna, said it best when she wrote that her brother's "missteps do not define the entirety of his character." (Letter from D. Meyer).[1] Mr. Meyer is, first and foremost, a dedicated family man, the loving husband to Katie, to whom he has been married since 2008, and father to their three children.

When they met, Katie was already the mother of a four-year-old special needs son, Jayden, whose biological father abandoned him soon after his premature birth at 24 weeks. In the first four years of Jayden's life, he endured a brain bleed, a tracheotomy and years-long use of a tracheostomy tube that destroyed his vocal chords, and three significant eye surgeries. By the age of three, Jayden was exhibiting significant developmental delays, and was soon diagnosed with low-functioning autism. Developmentally and cognitively, he is at the level of a 2-to-18-month-old child. He is non-verbal and is otherwise largely unable to communicate. He cannot work, cannot go to school, cannot use the toilet by himself, and requires round-the-clock care and supervision.

Before meeting Mr. Meyer, Katie relied heavily on her out-of-state parents to care for Jayden. But once Mr. Meyer came into their lives, he immediately and unhesitatingly stepped into the role of Jayden's father. In the years since, Jayden has grown extremely close to Mr. Meyer.

---

[1] The sentencing letters referenced in this memorandum are attached alphabetically as Composite Exhibit A.

3

(Letter from M. Taylor). Removing Mr. Meyer from the home for a substantial period of time would have a devastating effect on Jayden.

In addition to Jayden, there are two other children in Mr. Meyer's home who will also suffer profoundly from his absence: Mr. Meyer's and Katie's two biological children, daughter Jasime, who is twelve years old, and Jaxon who is ten. With both Mr. Meyer and Katie at home, one parent focuses on Jayden, leaving the other to care for Jasmine or Jaxon, to work, or to perform the endless array of tasks and issues that arise during any given day. For whatever period of time Mr. Meyer is incarcerated, all responsibilities will fall to Katie – a burden far greater than any one parent can or should be forced to bear. (Letter from M. Taylor).

To make matters worse, Katie is not entirely well. In 2013, Katie was diagnosed with an aggressive form of breast cancer that spread to her brain. (Letter from M. Taylor). Mr. Meyer accompanied his wife to Mexico in pursuit of alternate therapies. When those failed, he was by her side as she endured multiple rounds of radiation to the brain. By some miracle, Katie entered remission, but the radiation left her with SMART syndrome, which stands for stroke-like migraine attacks after radiation therapy – a debilitating condition for which there is no cure.

Policy Statement 5H1.6[2] makes clear that while "ordinar[y]" family circumstances do not justify a downward departure, extraordinary family circumstances may.[3] U.S.S.G. § 5H1.6; *United*

---

[2] Though styled as a Guideline, section 5H1.6 is actually a policy statement, designed to provide instructions regarding application of the Guidelines. *United States v. Johnson*, 964 F.2d 124, 127 (2d Cir. 1992). Unlike the Guidelines, which are used in determining the sentence to be imposed, is not subject to formal legislative review and therefore lacks the same degree of authority as the Advisory Guidelines. *United States v. Gaskill*, 991 F.2d 82, 85 (3d Cir. 1993).

[3] Extraordinary family circumstances have also been relied upon as a basis to vary downward under section 3553(a). *United States v. Gooch*, No. 2:20cr155, 2022 WL 1747334, at **2-3 (M.D. Ala. May 31, 2022),

*States v. Gaskill*, 991 F.2d at 85-86. According to the Commission, a departure based on the loss of caretaking of the defendant's family may be appropriate if:

(i)     The defendant's service of a sentence within the applicable guideline range will cause a substantial, direct, and specific loss of essential caretaking, or essential financial support, to the defendant's family.

(ii)    The loss of caretaking or financial support substantially exceeds the harm ordinarily incident to incarceration for a similarly situated defendant. For example, the fact that the defendant's family might incur some degree of financial hardship or suffer to some extent from the absence of a parent through incarceration is not in itself sufficient as a basis for departure because such hardship or suffering is of a sort ordinarily incident to incarceration.

(iii)   The loss of caretaking or financial support is one for which no effective remedial or ameliorative programs reasonably are available, making the defendant's caretaking or financial support irreplaceable to the defendant's family.

(iv)    The departure effectively will address the loss of caretaking or financial support.

U.S.S.G. § 5H1.6, cmt. n.1(B).[4]

Applying these factors, sentencing courts have not hesitated to depart or vary downward based on a defendant's extraordinary family circumstances. *See*, *e.g.*, *United States v. Haversat*, 22 F.3d 790, 797 (8th Cir. 1994) (affirming entitlement to section 5H1.6 departure where the defendant, convicted of violating the Sherman Antitrust Act, was actively involved in the care of his mentally ill wife); *United States v. Sclamo*, 997 F.2d 970, 972-74 (1st Cir. 1993) (affirming departure, from 28 months in prison to 6 months of home confinement plus 3 years' probation, based on the "crucially important relationship" the narcotics defendant formed with his partner's 12-year-old son who suffered from ADHD and whose condition would "risk regression" if the

---

[4] In addition to these factors, the Commission instructs sentencing courts to consider the seriousness of the offense and whether the offense involves the defendant's family members or poses any danger to members of the defendant's family (which Mr. Meyer's offense does not). U.S.S.G. § 5H1.6, cmt. n.1(A).

defendant was incarcerated); *United States v. Johnson*, 964 F.2d at 129 (affirming departure under section 5H1.6 and imposing sentence of six months of home detention on grounds that the defendant, convicted of bribery and theft of public money, was sole caregiver for three minor children, noting that the court was "reluctant to wreak extraordinary destruction on dependents who rely solely on the defendants for their upbringing"); *United States v. Pena*, 930 F.2d 1486, 1494-96 (10th Cir. 1991) (affirming eight-level departure from a range of 27 to 33 months to 6 months in a community treatment center for narcotics dealer who was sole provider for her infant child and 16-year-old daughter, herself a mother to a 2-month-old infant); *United States v. Alba*, 933 F.2d 1117, 1122 (2d Cir. 1991) (affirming downward departure based on extraordinary family circumstances where the narcotics defendant lived with and cared for his disabled father and two minor children); *United States v. Boeka*, No. 8:06-CR-115, 2006 WL 3780400, at **1-2, 4, 6 (D. Neb. Dec. 20, 2006) (granting downward departure under U.S.S.G. § 5H1.6 for bank robbery defendant who served as the primary caregiver for son with cerebral palsy who was unable to communicate, who had no ability to care for himself, and who shared a close emotional bond with his father that would have been imperiled if his father was sentenced to a term of imprisonment); *United States v. Graham*, No. 97 CR 482, 1998 WL 88885, at *5 (N.D. Ill. Feb. 20, 1998) (granting downward departure under section 5H1.6 where the bank robbery defendant took care of his physically disabled daughter-in-law and her two children while his son was at work).

The need for a meaningful departure or variance becomes even more pronounced where, as here, the defendant cares for a child on the autism spectrum. In *United States v. Gooch*, No. 2:20cr155, 2022 WL 1747334, at **2-3 (M.D. Ala. May 31, 2022), for example, the sentencing court varied downward under 18 U.S.C. § 3553(a) – from a range of 12 to 18 months to one day of incarceration plus three years of supervised release, the first six months of which would be served

on home confinement – based on the fact that two of the six children in the defendant's and her husband's care were on the autism spectrum and were effectively non-verbal, were unable to perform basic caretaking functions, and constantly needed to be shuttled to and from appointments with doctors and therapists.  In doing so, the court concluded that

> requiring Gooch to serve a sentence of incarceration would cause a substantial, direct, and specific loss of essential caretaking to her family; that the loss of caretaking would substantially exceed the harm ordinarily incident to incarceration for a similarly situated defendant; that Gooch's caretaking is irreplaceable to her family; and that, by substituting home detention for incarceration, the court prevent the loss of caretaking.

*Id.* at *3.

Similarly, in *United States v. Spero*, 382 F.3d 803 (8th Cir. 2004), the Eighth Circuit affirmed an eight-level downward departure for a bank-fraud defendant who played an important role in the care of his four children, one of whom suffered from a form of autism spectrum disorder. *Id.* at 804. Determining that the defendant's caretaking role was invaluable, the court concluded that "a long-term departure of [the defendant] from his son's life would cause an extreme setback for [his son] and the rest of the family." *Id.* at 805. "When one parent is critical to a child's well-being, as in this case, which qualifies as an exceptional circumstances justifying a downward departure." *Id.  See also United States v. Ahmad*, No. 21-1583, 2022 WL 6914662, at *4 (1st Cir. Oct. 12, 2022) (affirming sentence for defendant convicted of health care fraud where trial court varied downward from a range of 57 to 71 months to 24 months based on the defendant's parental responsibilities to his seven minor children, one of whom suffers from autism spectrum disorder and requires constant adult supervision); *United States v. Rose*, 722 F. Supp. 2d 1286, 1290 (M.D. Ala. 2010) (granting 3-level departure for defendant charged with narcotics offenses while in possession of a firearm, where the defendant served as caretaker for his partner's autistic nephew and was the family's primary source of income).

7

### 2.  Mr. Meyer's Community Service

Apart from his family, the most important thing in Mr. Meyer's life is his faith. An active member of his Church, Mr. Meyer has always "exemplif[ied] a compassionate heart toward those in need." (Letter from B. Janiga). For the two decades, he has put that compassion to work, devoting significant time and energy in the service of his community.[5] By one estimate, his efforts have positively impacted "literally tens of thousands of people" over the years. (Letter from K. Whitten). Among other things, Mr. Meyer volunteered weekly at Branchville Correctional Facility in Indiana, serving as a mentor and leading church services. (Letters from W. Askins, B. Janiga). He volunteered with two faith-based programs for at-risk youth (Impact Ministries and Dream Center), providing mentorship and tutoring. (Letter from Pastor R. Brown). He set up free weekly cookouts, known as God's Grill, for the homeless in underserved communities. (Letters from Pastor R. Mull, M. Tweeten). He funded and worked on the construction of a home through Habitat for Humanity (Letters from W. Askins, M. Tweeten). He volunteered at local homeless shelters. (Letter from K. Whitten). He hosted events for students as part of a campus ministry. (Letters from C. Mary, L. Oathout). He assisted his Church with the renovation of a historic church building. (Letters from Dr. M. Castro, Pastor R. Mull). He helped fund various outreach organizations, including ministries in India, Nepal, and Africa (Letters from Dr. M. Castro, C. Mary, K. Whitten). And, working with his Church, he performed construction, clean-up and salvage work after his community was devastated by a tornado.

---

[5] This Court may consider a defendant's charitable endeavors in fashioning an appropriate sentence under 18 U.S.C. § 3553(a). *See United States v. Sachs*, 717 F. App's 894, 896 (11th Cir. 2017).

### *The Nature of the Offense*

Mr. Meyer has pleaded guilty to and has accepted responsibility for his crime, fully appreciating that his actions have caused a significant loss to the Government. As a sign of his acceptance, he is cooperating with the Government and is committed to doing so after sentencing.[6] While the conduct that underlies his offense of conviction is unquestionably serious, two points warrant mention.

First, the Government's $20-plus-million loss figure, which rests on losses attributable to 39 clients, is overstated because it includes $5,140,800 attributable to one client, Jimmy Collins, who is not discussed in the Indictment or Superseding Information, and whose case does not involve willful misconduct on the part of Mr. Meyer. Collins came to Mr. Meyer in late-2015, seeking to implement the Meyer's tax plan by the close of that year. Although Mr. Meyer sent Collins all plan-related documents before year-end, Collins failed to execute them before the new year. Mr. Meyer fully admits that he knowingly backdated plan documents at the behest of his clients, but Collins was not such a case. Nor did Collins take out a loan against the donated assets or participate in a buyback – conduct that Mr. Meyer concedes would have been improper. We appreciate that reducing the loss amount by $5,140,800 will have no impact on Mr. Meyer's

---

[6] Even in the absence of a downward departure motion under U.S.S.G. § 5K1.1, courts have the power to vary downward from an Advisory Guidelines range based on a defendant's cooperation with law enforcement. *United States v. Valdes Gonzalez*, 554 F. App'x 862, 867 (11th Cir. 2014) (noting that a person's "cooperation [i]s relevant to the § 3553 factor concerning 'the history and characteristics' of the defendant[]"); *United States v. Sol*, 522 F. App'x 567, 568 (11th Cir. 2013) (concluding that district court properly considered the defendant's cooperation under § 3553); *United States v. Caballero*, 384 F. App'x 83, 85 (2d Cir. 2010) (finding the defendant's sentence reasonable where it incorporated a variance based on his cooperation).

guidelines calculation. But the loss amount must still be accurate.[7]

Even if the Government's $20 million tax loss calculation is accurate, the advisory guidelines, driven by that loss, overstate the seriousness of his offense because it does account for the millions of dollars in charitable contributions generated as a result of Mr. Meyer's tax plan.[8] To be clear, Mr. Meyer's tax plan, as executed, was illegal, and he is prepared to take full responsibility for his misconduct. But the reality that both he and many of his clients were motivated on some level by charitable intent, and that legitimate charities benefitted from the plan, should not be ignored. As reflected below and in Exhibit B, from 2003 (years before any investigation commenced) through 2022, over $33 million in charitable contributions were made benefitting a host of community and faith-based organizations – including Wounded Warriors Project, St. Jude Children's Research Hospital, American Red Cross and Doctors Without Borders – that may not have otherwise benefitted from these donations were it not for Mr. Meyer.

| | | |
|---|---:|---|
| National Endowment Association x3480 | $ 10,149,797.02 | **2003-2015** |
| Indiana Endowment Fund x2513 | $ 11,111,748.16 | **2013-2018** |
| Grace Heritage x9760 | $ 6,712,926.83 | **2009-2018** |
| Indiana Endowment LLC x1117 | $ 5,345,932.66 | **2015-2019** |
| Michael Meyer x0769 | $ 112,260.00 | **2010-2012** |
| Michael Meyer x9935 | $ 307,000.00 | **2015-2018** |
| Michael Meyer (other accounts) | $ 159,521.75 | **2019-2022** |
| | | |
| **Total Paid to Charities** | **$ 33,899,186.42** | |

---

[7] This is especially so given that the loss amount has the potential to drive Mr. Meyer's statutory maximum fine, even though the PSI has recommended that no fine be imposed given Mr. Meyer's other financial obligations.

[8] While this argument may not justify a departure from the Guidelines (*e.g.*, *United States v. Brennick*, 134 F.3d 10, 15 (1st Cir. 1998)), there is nothing preventing the Court from considering this position in connection with its section 3553(a) analysis.

### *The Need to Avoid Unwarranted Sentence Disparities*

Section 3553(a)(6) requires sentencing courts to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." This factor "concerns national disparities between defendants with similar criminal histories convicted of similar conduct...." *United States v. Conatser,* 514 F.3d 508, 521 (6th Cir. 2008).

According to data collected by the United States Sentencing Commission, defendants like Mr. Meyer– those aged 51 to 60, who committed similar offenses during the same time frame (fiscal years 2015 to 2023), who fell within the same criminal history category, and whose advisory guideline range, calculated in accordance with U.S.S.G. § 2T1.4, fell within Zone D – more than 91 percent received sentences of five years or less imprisonment.[9]

### *The Need to Provide Just Punishment, Afford Adequate Deterrence, and Protect the Public*

We fully appreciate that section 3553(a) grants this Court wide discretion in fashioning whatever sentence it deems "sufficient, but not greater than necessary" to provide just punishment, afford adequate deterrence, and protect the public. But we believe strongly that a noncustodial sentence would achieve each of these goals.

In terms of deterring future misconduct, the Supreme Court has been clear that sentencing courts need not impose longer or harsher sentences in order to "promote respect for the law." *Id.* at 54. Studies have shown that increasing the severity of a person's sentence does little to deter future crime.  U.S. Dep't of Justice, Nat'l Inst. Of Justice, *Five Things About Deterrence* (May

---

[9] *See* U.S.S.C. Interactive Data Analyzer, https://ida.ussc.gov/analytics/saw.dll?Dashboard (last visited Apr. 2, 2024). Although the docket entries are sealed, we understand that consistent with this data, the guidelines levels for Mr. Meyer's co-conspirators charged to date fall in the range of five years (or possibly even less).

2016) (*citing* Daniel S. Nagin, *Deterrence in the Twenty-First Century*, Crime and Justice: A Review of Research, vol. 43 (2013)). Further, lengthy prison sentences are actually less likely to reduce the likelihood of recidivism.  Valerie Wright, *Sentencing Project*, Deterrence in Criminal Justice: Evaluating Certainty v. Severity in Punishment 7 (2010) (finding that "[a]mong low-risk offenders, those who spent less time in prison were 4% less likely to recidivate than low-risk offenders who served longer sentences.").

In the same way that sentencing Mr. Meyer to a lengthy term of imprisonment would not deter future crime, nor would it impact his risk of recidivism. *Rodriguez*, 724 F. Supp. at 1120 (recognizing that section 3553 "envisions more severe sentences for defendants considered more likely to commit further crimes and less severe sentences for those unlikely to commit crimes."); *see also United States v. Shanshan Du*, 570 F. App'x 490, 508 (6th Cir. 2014) (granting downward variance, in part, based on the unlikelihood of recidivism).

In a study published in 2021 entitled, *Recidivism of Federal Offenders Released in 2010*,[10] the U.S. Sentencing Commission found that re-arrest rates were near the bottom for non-violent offenders over 40 with some college, with no criminal history, and who have accepted responsibility for their actions. *Id.* at 30-33. Like the subjects of the Commission's study, Mr. Meyer is well over 40, has both has undergraduate and post-graduate degrees, and is a non-violent offender with a Criminal History Category One who not only accepted responsibility but is cooperating with the Government. He has the support of his entire family, including his wife of more than a decade. And he can no longer practice law or work as a CPA. Accordingly, Mr. Meyer's recidivism risk is virtually non-existent. Indeed, as someone who has known Mr. Meyer for his entire life, his sister

---

[10] *See* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/ 20210930_Recidivism.pdf (Sep. 2021).

Donna believes strongly that not only will Mr. Meyer not reoffend, but he is someone who "can make amends and contribute positively to society once more." (Letter from D. Meyer).

## CONCLUSION

For the reasons set forth herein, Defendant Michael Meyer respectfully requests that this Court impose a sentence below the advisory Guidelines range.

Respectfully Submitted,

/s/ Jeffrey A. Neiman
Jeffrey A. Neiman
Fla. Bar No. 544469
jneiman@mnrlawfirm.com

Jeffrey E. Marcus
Fla Bar No. 310890
jmarcus@mnrlawfirm.com
**MARCUS NEIMAN RASHBAUM &
PINEIRO LLP**
100 Southeast Third Avenue, Suite 805
Ft. Lauderdale, Florida 33394
Telephone: (954) 462-1200

*Counsel for Defendant Meyer*

## CERTIFICATE OF SERVICE

I hereby certify that on April 5, 2024, a true and correct copy of the foregoing was served via CM/ECF on all counsel or parties of record.

By:     /s/ Jeffrey A. Neiman
        Jeffrey A. Neiman